# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2166

_____

United States of America,      *
     *
     Plaintiff - Appellee,      *
     * Appeal from the United States
     v.      * District Court for the Northern
     * District of Iowa.
Ryan Keith Mathison,      *
     *
     Defendant - Appellant.      *

_____

Submitted: November 13, 2007
Filed: March 11, 2008

_____

Before WOLLMAN, JOHN R. GIBSON, and BENTON, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

Ryan Mathison appeals from his conviction of engaging in a continuing criminal enterprise, conspiracy to engage in money laundering, and filing false income tax returns. Mathison argues that the evidence against him was insufficient to support the jury's verdict. He also contends that the district court should have declared a mistrial because the jurors were exposed to outside influences when they learned from news media and gossip that Mathison had absconded during trial. We affirm the judgment of the district court.[1]

_____

[1]The Honorable Mark W. Bennett, Chief Judge, United States District Court for the Northern District of Iowa.

The evidence at trial showed that Mathison and his friend Shad Derby ran a drug smuggling operation, bringing anabolic steroids, marijuana, methamphetamines, and cocaine from Mexico to Sioux City, Iowa. Their business model was to use friends and family as drivers, sending the drivers with large amounts of cash to El Paso, Texas, or else meeting the drivers there with the cash. Once in El Paso, the drivers would call a phone number, and a supplier would pick up their car or truck and bring it back with bundles of drugs secreted within giant stereo speakers in the vehicle. The drivers would drive back to Sioux City, where they would unload their cargo either at Derby's house, a shed outside of town rented by Mathison, or at Mathison's business, Stereo Town. The drivers were usually paid $50 per pound of marijuana transported. Mathison distributed the drugs around the areas of Sioux City, Iowa and Sioux Falls, South Dakota.

The evidence also showed that Mathison paid cash for at least two cars that were then registered in the names of Jennifer Urben-Potratz and Travis Olson, respectively. The Olson car was shown to have been paid for with drug money. William Sedelmeier, one of Mathison's drug customers, originally owned the car and Mathison bought it from him by paying off Sedelmeier's car loan. Sedelmeier paid off his car loan using Mathison's money; the money was the proceeds from marijuana that belonged to Mathison, but which Sedelmeier peddled for Mathison. After obtaining the car with drug proceeds, Mathison then sold the car to Travis Olson, ostensibly acting on behalf of Sedelmeier.

There was also evidence that Mathison filed income tax returns that did not show the true amount of his income for the year. Internal Revenue Service Agent James Biegger examined Mathison's financial records and testified that in the years 2000, 2001, 2002, and 2003, respectively, Mathison had income of $106,000, $234,805, $331,750, and $309,221, whereas his tax returns for those years showed income of only $27,073, $22,457, $54,179, and $78,066.

In a second superseding indictment, Mathison was charged with engaging in a continuing criminal enterprise, 21 U.S.C. §§ 848(a) & (c) (Count 1); conspiracy to possess with intent to distribute marijuana, cocaine, methamphetamines, and anabolic steroids, 21 U.S.C. §§ 841(b)(1)(A) & 846 (Count 2); conspiracy to engage in money laundering, 18 U.S.C. § 1956 (a)(1)(A)(i), (B)(i), (B)(ii) and § 1956(h) (Count 3); and filing false tax returns, 26 U.S.C. § 7206(1) (Counts 4-7).

Mathison's trial began on November 6, 2006, and he attended his trial until he failed to appear on November 13. That morning, the court determined that Mathison's failure to appear was voluntary and that the trial should proceed without him. However, the district court also learned that Mathison's disappearance had already been reported in the media; consequently, the court decided to voir dire the jurors to ascertain whether they had been exposed to information about Mathison's apparent flight. The court cautioned the jurors that they were not to hold Mathison's absence against him or to speculate on the cause for his absence. The court then questioned each juror individually, apart from the other jurors. Although most indicated that they had heard something, either from news accounts, gossip, or the other jurors, only one juror indicated that he would be unable to follow the court's directions to disregard what he had learned outside the courtroom. That juror was excused. Mathison did not challenge any of the other jurors for cause, and the court did not excuse any others.

The jury found Mathison guilty of all counts, but the district court dismissed the conspiracy count, Count 2, as a lesser included offense of the continuing criminal enterprise count. See United States v. Jelinek, 57 F.3d 655, 660 (8th Cir. 1995).

After the trial, Mathison was apprehended in Mexico and was returned to Iowa for his sentencing. The district court sentenced Mathison to 372 months' imprisonment on Count I, 240 months on Count 3, and 36 months on each of Counts 4-7, to be served concurrently.

-3-

I.

On appeal, Mathison contends that there was insufficient evidence to sustain the jury's verdict and therefore the district court should have granted his motions for acquittal under Fed. R. Crim. P. 29. Under Glasser v. United States, 315 U.S. 60, 80 (1942), the jury's verdict "must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." There is substantial evidence if any rational trier of fact could find each element of the crimes of conviction beyond a reasonable doubt. United States v. Crenshaw, 359 F.3d 977, 987-88 (8th Cir. 2004) (quoting Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)).

The evidence at the trial of this case was exhaustive, with testimony of thirty-one witnesses and documentary evidence of border crossings, bank accounts, airline travel, and telephone calls. Mathison's brief focusses on the continuing criminal enterprise conviction, and in particular, on the question of whether the government proved that Mathison supervised three of the six individuals whom the jury identified as his subordinates in the enterprise. At oral argument, Mathison's counsel conceded that there was adequate evidence of supervision of three other individuals the jury identified as subordinates, and that Mathison only disputes the adequacy of the evidence with regard to Constantine Klimiades, Ryan Everett, and William Sedelmeier. Counsel also agreed that it is only necessary for us to conclude that the evidence is sufficient with regard to two of these men in order to arrive at the total of five supervisees necessary to uphold the conviction.

The statutory crime of engaging in a continuing criminal enterprise consists of (1) commission of a felony violation of the federal narcotics laws; (2) as part of a continuing series of three or more related felony violations of the federal narcotics laws; (3) in concert with five or more other persons; (4) for whom the defendant was an organizer, manager, or supervisor; and (5) from which the defendant derived substantial income or resources. 21 U.S.C. § 848(c); United States v. Jackson, 345

F.3d 638, 645 (8th Cir. 2003). The element of acting as organizer, manager or supervisor has been liberally construed, United States v. Roley, 893 F.2d 992, 994 (8th Cir. 1990); United States v. Possick, 849 F.2d 332, 335 (8th Cir. 1988), and is satisfied if "the defendant exerted some type of influence over another individual as exemplified by that individual's compliance with the defendant's directions, instructions, or terms." Id. at 336. The statute does not require that the defendant supervise all five people at the same time. Id. at 335.

In the case of Ryan Everett, there is direct evidence that Everett took direction from Mathison, as well as from Shad Derby. Everett testified on direct:

> Q: At any time at least one time did Ryan Mathison hand you cash to go down to El Paso to get drugs?
> A: I believe so.
> Q: And when you would go down and get it, who would give you directions on how to go down, what to do, things like that? One or both of them [Mathison and Shad Derby]?
> A: They both would. You know, basically it was just a matter of having a phone number to call somebody, and, you know, tell them where I was at, and they'd come pick my truck up and take it.
> . . . .
> Q: When you got home, where would you take it?
> A: It depended. Sometimes we went to this shed. Other times I remember we did it at Shad's house.
> . . . .
> Q: And who was out there when you were out at the shed?
> A: Ryan and Shad.
> . . . .
> Q: And who would pay you the money for driving down, driving back?
> A: Shad and Ryan both would.

Mathison had rented the shed and possessed the key to it. On cross examination, Mathison's counsel asked Everett:

Q: Your instructions during these trips, they came from Shad Derby? Yes-or-no question.
A: You know, both, both of them gave me instruction, you know. I've been with Ryan before when he's made phone calls down there to try to get it lined up.
Q: But you got direction from Shad Derby.
A: I got directions from both of them.

This is ample evidence from which to find that Everett took direction from Mathison.

William Sedelmeier was originally simply a marijuana customer of Mathison's, who bought from Mathison and then resold the marijuana for his own account. However, when Sedelmeier found he was unable to make payments on his car loan, he wanted to avoid repossession of the car. Mathison paid off the loan on Sedelmeier's Mustang by making three payments of $7,000 each. Mathison and Sedelmeier raised the money to pay off the loan by Sedelmeier peddling thirty to thirty-five pounds of Mathison's marijuana, in two to five pound increments. Sedelmeier was asked, "You sold marijuana for Ryan Mathison?" and he answered, "Yeah." Sedelmeier said he sold the marijuana and turned over all the proceeds to Mathison. While Sedelmeier and Mathison were raising the $21,000, Sedelmeier kept possession of the car. Then, when the car was paid off and title rendered to Sedelmeier, he "just gave [Mathison] the keys to the vehicle and the title."

Deciding whether Mathison supervised, organized, or managed Sedelmeier requires close examination of our precedents. It is clear that the supervisory element of section 848(c) is not satisfied by a mere buyer-seller relationship. Jackson, 345 F.3d at 646. Moreover, the extension of credit or "fronting" the drugs is not enough to establish a supervisory relationship. United States v. Jones, 801 F.2d 304, 308 (8th Cir. 1986). "Fronting" is, nevertheless, a relevant factor that can fit with other facts to establish management. See Roley, 893 F.3d at 994; United States v. Maull, 806 F.2d 1340, 1344 (8th Cir. 1986); United States v. Witek, 61 F.3d 819, 824 (11th Cir.

1995) (fronting alone is insufficient, but it is relevant when combined with other facts; collecting cases). In Witek, the Eleventh Circuit drew a distinction between "fronting" or extending credit, which alone cannot establish management, and "consignment" of drugs, in which the defendant retains control and authority over the drugs in a street-dealer's possession. 61 F.3d at 824. We have recently held that substantial evidence supported the § 848 conviction of a defendant who provided substantial amounts of drugs in an ongoing relationship with lower-level drug dealers. United States v. Johnson, 495 F.3d 951 (8th Cir. 2007), petition for cert. filed, No. 07-9456 (Feb. 18, 2008). In Johnson, the lower-level dealers were described at trial as selling "for" the defendant, and they remitted some of their proceeds to him. Id. at 968. Similarly, in this case, Sedelmeier described himself as selling "for" Mathison, and he and Mathison had an ongoing relationship during the time it took for Sedelmeier to peddle thirty to thirty-five pounds of marijuana, which Mathison doled out in two- to five-pound amounts. Moreover, Sedelmeier turned all his proceeds over to Mathison, which indicates that the drugs still belonged to Mathison. We have held that a defendant manages someone who stores drugs for him, Roley, 893 F.2d at 995, and this reasoning would extend to someone who holds drugs belonging to the defendant for the purpose of selling them for the defendant. There is a meaningful distinction between "mere fronting," in which the defendant may merely supply drugs on credit to a consumer, and the facts of this case, in which Mathison regularly turned over drugs to Sedelmeier with the arrangement that Sedelmeier would sell the drugs and remit the entire proceeds to Mathison. A reasonable finder of fact could conclude that Sedelmeier sold the marijuana on consignment for Mathison, in compliance with Mathison's "terms." See Jackson, 345 F.3d at 646.

Having concluded that Mathison supervised, managed, or organized Everett and Sedelmeier, we need go no further, since this established five supervisees. We conclude that substantial evidence supported Mathison's conviction for engaging in a continuing criminal enterprise.

Mathison states in one sentence that there was not sufficient evidence to support his conviction for conspiracy, money laundering, or filing false tax returns. This one-sentence argument is not sufficient to preserve these issues for appeal because Mathison was required to provide reasons and citations to the record to support his contention. See Fed. R. App. P. 28(a)(9)(A); United States v. Zavala, 427 F.3d 562, 564-65 n.1 (8th Cir. 2005). However, we have carefully reviewed the evidence and conclude that there is evidence to support the convictions for conspiracy to commit money laundering and filing of false tax returns, 18 U.S.C. § 1956(a)(1)(B)(i) & § 1956(h) and 26 U.S.C. § 7206(1).

## II.

Mathison argues that the district court erred in denying his motion for a mistrial based on the jurors' exposure to news and other reports from outside the courtroom concerning Mathison's flight.

We review for abuse of discretion a district court's decision on whether to grant a new trial on account of jurors' exposure to outside influences. United States v. Tucker, 243 F.3d 499, 509 (8th Cir. 2001). The question of whether outside contacts were prejudicial is a factual question, reviewed for clear error. Id.

This circuit has prescribed a procedure to be followed where it appears that the jury may have been exposed to adverse publicity or other outside influence during the trial: (1) the district court should determine whether the outside influence creates a danger of substantial prejudice to the accused; (2) if so, the court should poll the jurors individually to see if they were exposed; and (3) if they were exposed, the court should determine the extent and effect of the exposure and decide on appropriate remedial measures. Tunstall v. Hopkins, 306 F.3d 601, 610 (8th Cir. 2002); United States v. Hood, 593 F.2d 293, 296 (8th Cir. 1979). The district court in this case meticulously followed this procedure, examining each juror individually, excusing the

one juror who expressed an inability to follow the court's instructions and cautioning the others not to speculate on the cause for Mathison's absence from trial and not to hold his absence against him. Mathison did not move to strike any other juror for cause, though invited to do so. Therefore, the district court did not commit any procedural error in responding to the reports of publicity.

As for the substantive decision not to grant a new trial, we see no abuse of discretion. The district court's decision that the remaining jurors were able to proceed in accordance with their instructions was not clearly erroneous. It was, of course, unavoidable that the jury would become aware of Mathison's absence from trial simply because Mathison would not be present in the courtroom. Mathison points to no authority granting him an automatic right to a new trial because he ran away, and such a rule would create perverse incentives for defendants whose trial was going badly. The district court did not abuse its discretion in denying Mathison's motion for a new trial.

## III.

Mathison's counsel lodged a Fed. R. App. P. 28(j) letter with the court after the case was submitted, attempting to raise a sentencing argument for the first time, based on the new Supreme Court case of Gall v. United States, 128 S. Ct. 586 (2007). It is a sufficient answer to say that parties may not raise new arguments in Rule 28(j) letters, United States v. Kicklighter, 413 F.3d 915, 918 (8th Cir. 2005), but we will add that Mathison and his counsel argued unsuccessfully before the district court that Mathison should receive a variance from the Guidelines sentence, and there is no indication whatsoever that the district court misunderstood the extent of his discretion or erred in exercising it.

We affirm Mathison's convictions.

_____