# United States Court of Appeals

## For the Eighth Circuit

_____

No. 20-1960
_____

Lauren Hawse; Frank R. O'Brien, Jr.; Jean M. O'Brien; Stephen J. Pieper,

*Plaintiffs - Appellants*,

v.

Sam Page, in his capacity as County Executive of St. Louis County, Missouri;
Faisal Khan, in his capacity as Director of the St. Louis County Public Health
Department,[1]

*Defendants - Appellees*.
_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis
_____

Submitted: April 19, 2021
Filed: July 30, 2021
_____

Before COLLOTON, KELLY, and STRAS, Circuit Judges.
_____

---

[1]Director Khan is automatically substituted for his predecessor under Federal
Rule of Appellate Procedure 43(c)(2).

COLLOTON, Circuit Judge.

The appellants in this case challenged a public health order entered by St. Louis County in April 2020. The district court[2] ruled that there was no Article III case or controversy because the appellants failed to allege adequately that an order of the court would redress their injuries. We conclude that the appellants lack Article III standing, and that any controversy is now moot, so we affirm the district court's dismissal of the complaint.

I.

In the early weeks of the COVID-19 pandemic, the St. Louis County Acting Director of Public Health issued a "Stay at Home Order." The order's stated intent was "to ensure that the maximum number of people remain in their places of residence to the maximum extent feasible, while enabling essential services to continue, to slow the spread of COVID-19 within St. Louis County." The order defined activities necessary for a person to participate in religious services and other spiritual practices as "essential activities" that were not forbidden, but only to the extent that the activities complied with a gathering size limitation of fewer than ten people in a single room or space. The order distinguished between churches, which were subject to the gathering size limitation, and various secular businesses that were not.

The order took effect on March 28, 2020, with an expiration date of April 22, 2020. R. Doc. 2-1. On April 20, the County replaced the March 28 order with an

---

[2]The Honorable Ronnie L. White, United States District Judge for the Eastern District of Missouri.

amended order that continued the same limitations.[3]  On May 18, 2020, however, the County superseded the April 20 order, eliminated the requirement that religious gatherings be limited to fewer than ten persons, and established capacity restrictions of ten percent or twenty-five percent of a building's authorized occupancy, depending on the size of the building.[4]  The May 18 order applied those same capacity restrictions to big box stores, supermarkets, restaurants, and other businesses that engaged in direct interactions with members of the public.  Subsequent orders over the next year imposed gathering size limitations ranging from twenty-five percent to fifty percent of a building's authorized occupancy.  On May 14, 2021, the County rescinded all restrictions on religious gatherings, and there is currently no COVID-based limit on the number of persons who may attend a religious service or any other activity in St. Louis County.

In a complaint filed on April 28, 2020, the appellants sued county officials, seeking declaratory and injunctive relief.  They claimed that the Public Health Order of April 20, 2020, violated their rights to free exercise of religion, freedom of expression, freedom of association, and freedom of assembly under federal and state law.  In four separate counts, they invoked the First and Fourteenth Amendments, the Missouri Constitution, and the Missouri Religious Freedom Restoration Act.

---

[3]Emily Doucette, St. Louis Cnty. Dep't of Pub. Health, 2019 Novel Coronavirus ("COVID-19") Extension and Amendment of Stay at Home Order (Apr. 20, 2020), https://stlcorona.com/dr-pages-messages/public-health-orders/all-public-health-orders-archives/director-of-public-health-extension-and-amendment-of-stay-at-home-order/.

[4]Emily Doucette, St. Louis Cnty. Dep't of Pub. Health, 2019 Novel Coronavirus ("COVID-19") Business and Individual Guidelines for Social Distancing and Re-Opening (May 8, 2020), https://stlcorona.com/sites/default/assets/pdfs/dph-orders/st-louis-county-dph-orders-business-individual-guidlines-05082020-0.pdf [hereinafter Public Health Order of May 2020].

The district court ruled that the appellants lacked Article III standing on these claims because they did not adequately allege that an order of the court would redress their injuries. The court reasoned that the complaint did not allege that the Public Health Order was responsible for the closure of the appellants' churches, or that the churches would hold gatherings of ten or more people but for the Order. Accordingly, the court dismissed the four counts without prejudice for lack of standing. (The district court declined to dismiss a fifth count based on the Due Process Clause, but the appellants later dismissed that claim voluntarily with prejudice.)

Appellants filed a notice of appeal on May 11, 2020. On May 12, the appellants moved for an injunction pending appeal. The appellants filed their reply in support of that motion on May 18, after receiving a requested extension of time. On May 18, 2020, the County superseded the challenged Order. On May 19, this panel denied the motion for injunction pending appeal without dissent. In July 2020, the appellees moved to dismiss the appeal as moot. This panel, without dissent, ordered the motion taken with the case for consideration after full briefing and oral argument. (Of course, mootness must be reassessed at the time of decision in any event.) The appellants did not seek expedited treatment of the appeal, and after briefing was completed, the case was scheduled for oral argument in the ordinary course during April 2021. The record accurately reflects no vote by the dissenting judge to expedite the appeal on the court's own motion, and there is no call for the dissent to demean the court's ordinary case processing as an exercise in "letting this case sit." The appeal was handled properly like any other case in which the appellants are content to proceed with a normal schedule for briefing and oral argument.[5]

_____

[5]The dissent also chooses to revisit whether this court should have requested a response to a petition for writ of mandamus that the appellants filed on May 5, 2020, asking this court to rule on their motion for a preliminary injunction while the district court was considering the motion in the first instance. As we explained then,

II.

To establish Article III standing, a plaintiff must have suffered an injury in fact that is fairly traceable to the defendant's challenged action, and it must be likely that the injury will be redressed by a favorable judicial decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). A plaintiff must support each element of standing "in the same way as any other matter on which the plaintiff bears the burden of proof." *Id.* at 561. Therefore, to survive a motion to dismiss for lack of jurisdiction, a plaintiff must allege sufficient factual matter, accepted as true, to support a reasonable and plausible inference that she satisfies the elements of Article III standing. *Auer v. Trans Union, LLC*, 902 F.3d 873, 878 (8th Cir. 2018); *Stalley ex rel. United States v. Cath. Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2007) ("The plaintiff must assert facts that affirmatively and plausibly suggest that the pleader has the right he claims (here, the right to jurisdiction), rather than facts that are merely consistent with such a right.") (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)); *Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir. 2015) (collecting cases); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[6]

---

an order requiring a response in the court of appeals would effectively have overridden the district court's briefing schedule and resulted in parallel and duplicative litigation of the same motion. The district court's scheduling order was not a clear abuse of discretion, and the appellants did not have a clear and indisputable right to relief from this court before the district court ruled on their motion. *See Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 381 (2004).

[6]In cases decided before *Iqbal* and *Twombly*, a court presented with an issue of Article III standing would "presume[] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990). But the Court in *National Wildlife Federation* expressly drew that formulation from the permissive pleading regime of *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), which was retired by *Twombly*. 550 U.S. at 561-63. Some post-*Twombly* decisions, like the dissent in this case, quote the phrase without identifying its origin. We see no reason why an analytical approach taken specifically

On appeal, the appellants contend primarily that the district court erred in two respects when it concluded that they lacked standing. First, they argue that the court mistakenly construed the complaint to allege only that the Order precluded them from participating in religious activities in their churches, as opposed to other locations. Second, they maintain that even as to religious activities at church, the complaint adequately alleged that injunctive relief would redress their injuries. The County defends the district court's conclusion on standing and also maintains that the case is moot.

The most important factual allegations relevant to the question of standing are set forth in three paragraphs of the complaint. As indicated by italics in the quotations below, those paragraphs focus on religious activity in churches attended by the appellants:

> 1.  Plaintiff Lauren Hawse is a resident of St. Louis County, Missouri, who is a Christian. *Attending and participating in worship and fellowship in her church community*, especially on Sundays, is an essential requirement of her sincerely held religious belief. As a result of restrictions imposed by the defendants as set forth below, *she has been unable to attend Sunday services and other religious activities in which she usually participates* and she has been impeded in her exercise of rights to freely associate and assemble and to freedom of expression. *The church building in which she regularly worships* has a seating capacity of up to 600, and there is ample space for 150 to exercise proper social distancing. *Her church is also equipped* with hand sanitizers and other materials to enable visitors to observe appropriate hygienic precautions related to the COVID-19 situation.
>
> 2.  Plaintiffs Frank and Jean O'Brien, husband and wife, are residents of St. Louis County, Missouri. They are Christians. *Attending and participating in worship and fellowship in their church community*,

from an abrogated decision would survive the abrogation.

-6-

especially on Sundays, is an essential requirement of their sincerely held religious belief. As a result of restrictions imposed by the defendants as set forth below, *they have been unable to attend Sunday services and other religious activities in which they usually participate* and they have been impeded in their exercise of rights to freely associate and assemble and to freedom of expression. *The church building in which they regularly worship* has a seating capacity of at least 500, and there is ample space for 150 to exercise proper social distancing. *Their church is also equipped* with hand sanitizers and other materials to enable visitors to observe appropriate hygienic precautions related to the COVID-19 situation.

3. Plaintiff Stephen Pieper, M.D. is a resident of Glencoe, St. Louis County, Missouri, who is a Christian. *Attending and participating in worship and fellowship in his church community*, especially on Sundays, is an essential requirement of his sincerely held religious belief. As a result of restrictions imposed by the defendants as set forth below, *he has been unable to attend Sunday services and other religious activities in which he usually participates* and he has been impeded in his exercise of rights to freely associate and assemble and to freedom of expression. *The church building in which he regularly worships* has a seating capacity of approximately 800, and there is ample space for a third of that number to exercise proper social distancing. *His church is also equipped* with hand sanitizers and other materials to enable visitors to observe appropriate hygienic precautions related to the COVID-19 situation.

R. Doc. 1, at 2-3 (emphases added). The complaint continued by alleging that the Order discriminated on the basis of religion, because there was no rational basis to distinguish between "Walmart shoppers, for example," and "church goers who observe the same social distancing and other hygienic precautions." *Id*. at 7.

A fair and neutral reading of these allegations shows that the appellants complained that the Order prevented them from engaging in activities at their respective churches. Each paragraph begins by alleging that the party's religious

beliefs call for attending and participating in activities in their church communities. Each paragraph concludes by asserting that the relevant church building has sufficient space to allow for social distancing and is equipped with materials to address the risks of COVID-19. In between, each paragraph alleges that the party has been unable to attend Sunday services and other religious activities in which he or she usually participates. In context, that sentence naturally refers to services and activities at the party's church. In crafting their complaint, the appellants elected to characterize the Order as a restriction on their sincerely held religious belief that they must attend "worship and fellowship in their church community." The district court properly construed a parallel reference to "services and other religious activities" to mean activities in the church community. That interpretation was consonant with the complaint's assertion on the merits that the Order discriminated against "church goers."

The appellants argue that the phrase "other religious activities" encompasses all manner of religious activities (Bible studies, prayer meetings, doctrine classes, religious discussions, witness groups, weddings, funerals, baptisms, ordinations, dedications, wakes, and support groups) undertaken at various locations (in a park, a conference room, a private home, or elsewhere). On this view, the district court mistakenly limited its standing analysis to religious activities at a church.

We are not convinced that the phrase "other religious activities," in the context that the appellants chose to present it, takes on such an expansive meaning. The complaint sets forth detailed information about the size and amenities of churches, and objects to discrimination against churchgoers, but includes no allegation that the appellants sought to gather with ten or more persons in a park or a conference room. The appellants bore the burden to allege facts sufficient to establish standing. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990). The appellants were obliged to allege sufficient factual content that would support a reasonable inference that they sought to engage in religious activities with a group of ten or more people

-8-

outside a church. It would have been a simple matter to do so if the appellants had a basis to make such an allegation. But there was no error in the district court's ruling that the appellants could not amend their complaint, or supplement insufficient factual allegations, in a brief filed in opposition to a motion to dismiss. *Morgan Distrib. Co. v. Unidynamic Corp.*, 868 F.2d 992, 995 (8th Cir. 1989). We therefore conclude that the district court properly limited its analysis to whether the appellants alleged a redressable injury arising from their inability to participate in religious activities with ten or more persons at their respective churches.[7]

On the question of redressability for the injuries alleged, we agree with the district court that the complaint does not adequately allege that an injunction against enforcement of the April 2020 Public Health Order would have redressed the appellants' injuries. Whether or not the churches were formally closed in April 2020, the complaint is bereft of an allegation that but for the Order, the churches attended by the appellants would have allowed groups of ten or more persons to gather in the early weeks of the pandemic. The district court took judicial notice, for example, that even after the County's nine-person gathering limit was scheduled for elimination on May 18, 2020, each Catholic parish in St. Louis would decide for itself whether to reopen and allow larger gatherings. R. Doc. 25, at 7 & n.1. The appellants' conclusory assertion that they were unable to attend services and other religious activities "[a]s a result" of the Order is insufficient to allege redressability. Courts are not bound to accept as true a legal conclusion couched as a factual allegation.

---

[7]The appellants argue briefly that the district court erred in dismissing three counts of the complaint because those counts alleged that the Order also infringed on their rights to engage in "many different activities in association with others and in furtherance of, among other things, charitable, educational, artistic, social, cultural, religious, and political objectives and for the communication of ideas in connection therewith." R. Doc. 1, at 10. These "naked assertions," however, are "devoid of further factual enhancement," *Iqbal*, 556 U.S. at 678 (internal quotation and alteration omitted), and they are thus insufficient to establish a plausible allegation that the appellants' injuries extended beyond activities in their church communities.

*Iqbal*, 556 U.S. at 678. The assertion that an injury was "a result" of the County's action is a threadbare allegation of an element of standing. Without a sufficient factual allegation that the appellants' churches would allow ten or more persons to gather if the Public Health Order were enjoined, the complaint did not adequately allege Article III standing.[8]

Under the rules of procedure, the appellants had ample opportunity to revise their complaint to allege a different injury. After the County moved to dismiss on May 4, 2020, or after the district court dismissed several claims without prejudice on May 11, 2020, the appellants could have amended their complaint to add new allegations about restrictions on religious activities conducted outside a church. *See* Fed. R. Civ. P. 15(a)(1), (a)(2). Or they could have filed a new complaint alleging such an injury. *See McCarney v. Ford Motor Co.*, 657 F.2d 230, 233-34 (8th Cir. 1981). The courts in this circuit, in the context of election disputes, death penalty litigation, and other urgent matters, have demonstrated the capacity to resolve time-sensitive requests for relief in a matter of days. If the appellants wished to engage in, say, religious activities in a park with ten or more persons between May 4 and May 18, 2020, then there were avenues available for them to plead the new allegation and to secure a prompt ruling on the merits of that claim. But the appellants chose instead to rest on their original complaint and to pursue an appeal of the district court's order, even though the challenged public health order was superseded as of May 18, 2020.

_____

[8]In a letter filed under Federal Rule of Appellate Procedure 28(j), the appellants argue that a request for nominal damages is sufficient to establish the redressability element of standing. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021). The complaint, however, did not seek nominal damages, and a boilerplate request for "such other and further relief as the Court deems just and proper" is insufficient to preserve a claim for nominal damages. *Foodbuy, LLC v. Gregory Packaging, Inc.*, 987 F.3d 102, 116 (4th Cir. 2021). Appellants' opening brief on appeal, moreover, mentioned only declaratory and injunctive relief, and parties may not raise new arguments in a Rule 28(j) letter. *United States v. Mathison*, 518 F.3d 935, 941-42 (8th Cir. 2008).

We conclude that the district court properly construed the complaint and correctly dismissed it for lack of an Article III case or controversy.

## III.

Alternatively, even if the appellants had adequately alleged Article III standing in May 2020, any controversy over the Public Health Order of April 20, 2020, is now moot. To be sure, "even if the government withdraws or modifies a COVID restriction in the course of litigation, that does not necessarily moot the case." *Tandon v. Newsom*, 141 S. Ct. 1294, 1297 (2021) (per curiam). At the same time, however, that the government once imposed a particular COVID restriction does not necessarily mean that litigation over a defunct restriction presents a live controversy in perpetuity. Where it is absolutely clear that the County's disputed conduct could not reasonably be expected to recur, an action challenging a superseded public health order is moot. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). Resolution of the mootness question requires attention to the particular circumstances of the case.

There is no reasonable expectation here that the County will reinstate the Public Health Order of April 20, 2020, limit religious gatherings to fewer than ten persons, and distinguish between attending religious services and shopping at big box stores. The disputed order was superseded in May 2020 in light of changing public health conditions, and circumstances have evolved substantially since then.

For more than a year, the County has permitted churches to host gatherings up to at least twenty-five percent of the authorized fire or building code occupancy. With the emerging availability of vaccines for COVID-19, and declining COVID-19 case numbers, restrictions on capacity were increased to fifty percent of occupancy

-11-

in February 2021.[9]  In early May 2021, the County abolished any restriction based on percentage of occupancy and provided only that churches, for-profit businesses, and others must limit capacity to the extent necessary to maintain social distancing of six feet between persons.[10]  On May 14, 2021, after the Centers for Disease Control and Prevention announced generally that vaccinated persons no longer need to wear a mask or physically distance in any setting, the County eliminated all restrictions on religious gatherings.[11]

Although the emergence of the Delta variant of the coronavirus led the County on July 26, 2021, to require the use of face coverings at indoor and enclosed public buildings and spaces,[12] there are no gathering restrictions in effect, and certainly none approaching a rule that would prohibit as few as ten persons from entering a church despite vaccinations.  The challenged order was superseded fourteen months ago, and the County has no track record of "moving the goalposts" in a way that places the appellants under a constant threat of renewed single-digit gathering limits.  *Cf.*

----

[9]Emily Doucette, St. Louis Cnty. Dep't of Pub. Health, 2019 Novel Coronavirus ("COVID-19") Third Amended Safer At Home Order (Feb. 9, 2021), https://stlcorona.com/sites/default/assets/pdfs/dph-orders/Third-Amended-Safer-at-Home-02092021.pdf.

[10]Faisal Khan, St. Louis Cnty. Dep't of Pub. Health, 2019 Novel Coronavirus ("COVID-19") Reopen STL Order (May 3, 2021), https://stlcorona.com/sites/default/assets/pdfs/dph-orders/reopenstl-050321.pdf.

[11]Faisal Khan, St. Louis Cnty. Dep't of Pub. Health, Recission of St. Louis County Department of Public Health 2019 Novel Coronavirus ("COVID-19") Reopen STL Order (May 14, 2021), https://stlcorona.com/sites/default/assets/pdfs/dph-orders/Recission-of-St-Louis-County-Department-of-Public-Health-2019-Novel-Coronavirus-Reopen-STL-Order-05-13-2021.pdf.

[12]Faisal Khan, St. Louis Cnty. Dep't of Pub. Health, 2019 Novel Coronavirus ("COVID-19") Face Covering Order (July 26, 2021), https://stlcorona.com/sites/default/assets/pdfs/dph-orders/face-covering-order-2021-07-26.pdf.

*Tandon*, 141 S. Ct. at 1297; *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020) (per curiam). Given the developments since May 2020, there is no reasonable expectation that the County will reinstate its Public Health Order of April 2020 and limit religious gatherings to fewer than ten persons.

In addition to substantial changes in public health conditions since May 2020, there also have been developments in the law. At the outset of the pandemic, it was not clear how the law would apply to restrictions on religious gatherings. While it was generally understood that churches hosting religious services could not be treated less favorably than other venues that held gatherings of large groups of people in close proximity for extended periods of time, the contours of this neutrality principle were not well defined. *See S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020). What constitutes a "comparable secular activity" that may be treated no more favorably than religious activity has divided the Supreme Court, but the Court has now ruled that the relevant comparison extends beyond movie theaters and lecture halls to hardware stores, hair salons, acupuncture facilities, and garages. *Tandon*, 141 S. Ct. at 1297; *Roman Cath. Diocese of Brooklyn*, 141 S. Ct. at 66. Even in the hypothetical event that the County were to reinstate gathering limits of fewer than ten persons, there is no reasonable expectation that the County would flout the Supreme Court's intervening pronouncements on equal treatment between religious exercise and comparable secular activity. *See Christian Coal. of Ala. v. Cole*, 355 F.3d 1288, 1292-93 (11th Cir. 2004). Indeed, well before the Court's decisions in *Tandon* and *Roman Catholic Diocese of Brooklyn*, the County abandoned any gathering-limit distinction between religious entities and secular businesses like retail facilities, personal service facilities, restaurants, and fitness centers.[13]

---

[13]*See* Public Health Order of May 2020, *supra* note 4; *see also* St. Louis Cnty. Dep't of Pub. Health, 2019 Novel Coronavirus Guidelines for Businesses Restricted by Capacity Limitations, https://stlcorona.com/sites/default/assets/pdfs/dph-orders/st-louis-county-business-restricted-capacity-limitations-guidelines-06012020-1.pdf (June 12, 2020).

In light of the current factual and legal circumstances, the appellants' challenge to the County's long-superseded Public Health Order of April 2020 is moot. "[I]t can be said with assurance that there is no reasonable expectation that the alleged violation will recur." *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (internal quotation and ellipsis omitted).

\*　　\*　　\*

The free exercise of religion is an important constitutional value, enshrined in the First Amendment. But so too is the case-or-controversy requirement of Article III, which serves as the foundation for the exercise of all judicial power. "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (internal quotation and alteration omitted). The doctrines of standing and mootness, properly applied, ensure that federal courts will decide only concrete disputes and will refrain from publishing advisory opinions or judicial essays on issues of the day. It is no slight to religious liberty to recognize as we do that the appellants in this particular matter have not established the existence of a case or controversy under Article III.

The judgment of the district court dismissing Counts I, II, IV, and V of the complaint without prejudice for lack of a case or controversy is affirmed. The County's motion to dismiss the appeal as moot is denied, as the question of mootness is addressed in the opinion as an alternative ground for affirmance. *See Wis. Right to Life, Inc. v. Schober*, 366 F.3d 485, 490-92 (7th Cir. 2004). Appellants' unopposed motions to take judicial notice and to file a corrected response to the motion to dismiss are granted.

STRAS, Circuit Judge, dissenting.

The court has a funny way of safeguarding "important constitutional value[s]." *Ante* at 14. After letting this case sit for over a year, it locks and deadbolts the courthouse door for a group of plaintiffs trying to challenge a stay-at-home order that specifically targeted "religious services and other spiritual practices." I would allow the case to finally move forward.

I.

Early in the COVID-19 pandemic, St. Louis County, Missouri, prohibited anyone from leaving home to participate in religious activities involving "ten or more people in a single space or room." Another part of the order classified "churches, religious services, and other spiritual practices" as essential, but unlike others in that category, singled them out as subject to the gathering-size limit.

Four residents challenged the stay-at-home order on the ground that, by discriminating against religion, it violated the Free Exercise Clause of the First Amendment. They immediately sought a temporary restraining order against the gathering-size limit but made clear that they were not challenging the remainder of the County's "social distancing and hygienic" requirements. Despite a request for expedited consideration, the district court did not move with urgency.

The plaintiffs turned to us. They filed an emergency petition for a writ of mandamus asking us to intervene and grant the injunctive relief they had requested. Over my dissent, and without even asking for a response, the court denied the petition and sent the plaintiffs back to wait for the district court to act. *See* Judgment, *In re Hawse*, No. 20-1920 (8th Cir. May 8, 2020). *But see id.* at 2 (Stras, J., dissenting) (contrasting the "fast-moving fight against the virus" with the district court's "conspicuous lack of urgency").

-15-

When it finally did, the plaintiffs were turned away after being told that they lacked standing. The problem, at least from the district court's perspective, was that their complaint failed to specifically allege a traceable or redressable injury. Once again, the plaintiffs asked us to move quickly, this time by entering an injunction pending appeal. Their second attempt turned out no better than their first. Order, *Hawse v. Page*, No. 20-1960 (8th Cir. May 19, 2020). And rather than dealing with mootness when the County first filed its motion to dismiss, we let it sit too.[14] Order, *Hawse v. Page*, No. 20-1960 (8th Cir. Aug. 6, 2020).

Ever since this flurry of activity, the case has been sitting on our docket. It is true, as the court points out, that "[t]he [plaintiffs] did not seek expedited treatment *of the appeal*" during that time. *Ante* at 4 (emphasis added). But it is hard to blame them for doubting that their luck would improve after we twice turned down opportunities to treat their case with the urgency they thought it deserved. Besides, we easily could have expedited the appeal "[o]n [our] own." Fed. R. App. P. 2; *see, e.g.*, *Mille Lacs Band of Chippewa Indians v. Minnesota*, 48 F.3d 373, 375 (8th Cir. 1995) ("order[ing] an expedited appeal").

Today, over a year later, we finally provide the plaintiffs with an answer but, just like the district court, slam the courthouse doors shut. The court not only agrees that the plaintiffs lacked standing from the beginning, but it now holds the delay against them to conclude that the case has become moot. On both points, I could not disagree more.

---

[14]I have never thought this case is moot, so I would have denied the motion.

-16-

II.

Although this case has lingered, procedurally it is just beginning. We have only the complaint itself and the parties' arguments about it, both here and in the district court. Our task, given this procedural posture, is to determine whether the complaint adequately alleges: "(1) an injury in fact; (2) a causal connection between the injury and [enforcement of] the challenged [order]; and (3) that a favorable decision is likely to redress [the plaintiffs'] injury." *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 749 (8th Cir. 2019). In making this de-novo determination, we must "accept[] the material allegations in the complaint as true and draw[] all inferences in [the] plaintiffs' favor." *Alleruzzo v. SuperValu, Inc.* (*In re SuperValu, Inc., Customer Data Sec. Breach Litig.*), 870 F.3d 763, 768 (8th Cir. 2017).

The pleading bar for standing is pretty low compared to the "higher hurdles" ordinarily present for surviving a motion to dismiss. *Brown v. Medtronic, Inc.*, 628 F.3d 451, 459 (8th Cir. 2010); *see also Miller v. Redwood Toxicology Lab'y, Inc.*, 688 F.3d 928, 936 n.6 (8th Cir. 2012). In this context, a complaint needs only "*general* factual allegations of injury resulting from the defendant[s'] conduct," because "we presume that general allegations embrace those specific facts that are necessary to support the claim."[15] *Bennett v. Spear*, 520 U.S. 154, 168 (1997) (emphasis added)

[15]I am puzzled by the suggestion that this standard was abrogated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). The Supreme Court expressly based its decision in *Twombly* on the requirement in Federal Rule of Civil Procedure 8(a)(2) that the "short and plain statement of the claim" must also "*show*[] that the pleader *is entitled to relief*," which is absent from the section of the rule that governs jurisdiction. (Emphasis added). *See Twombly*, 550 U.S. at 557; *accord Ashcroft v. Iqbal*, 556 U.S. 662, 677–79 (2009); *cf.* Fed. R. Civ. P. 8(a)(1) (requiring only "a short and plain statement of the grounds for the court's jurisdiction").

Perhaps as importantly, the court is correct that our "post-*Twombly* decisions" say that general allegations are enough to establish standing. *Ante* at 5 n.6; *see, e.g.*,

-17-

(internal quotation marks and brackets omitted); *accord In re SuperValu*, 870 F.3d at 772–73.

## A.

The complaint in this case clears this lower bar with some room to spare. It alleges that the plaintiffs were injured by being "unable to attend Sunday services and other religious activities in which they usually participate." *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016) (noting that an infringement of the right to free exercise of religion can support standing). It then explains how their inability to do either was "a result of" the stay-at-home order. *See In re SuperValu*, 870 F.3d at 772 (discussing causation). And finally, it describes how "[a]ttending and participating in worship and fellowship in their church community . . . is an essential requirement of their sincerely held religious belief[s]," which leads to the obvious inference that they would resume "participat[ion]" if they could. Although these allegations fall into the "general" category, they check all the standing boxes: injury-in-fact, causation, and redressability. *Bennett*, 520 U.S. at 168 (quotation marks omitted).

---

*Auer v. Trans Union, LLC*, 902 F.3d 873, 878 (8th Cir. 2018) (explaining that a plaintiff "lacked Article III standing" because she "failed to plead even 'general factual allegations of injury'" (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)); *In re SuperValu*, 870 F.3d at 772–73. However, far from just "quot[ing] the [rule] without identifying its origin," *ante* at 5 n.6, we have specifically considered the question of what plaintiffs must plead to survive a motion to dismiss in these circumstances. Our answer: *Twombly*, *Iqbal*, and the rest of "the Rule 12(b)(6) rubric" are "ill-suited to . . . the constitutional standing context" because "they deal with a fundamentally different issue." *Miller*, 688 F.3d at 936 n.6. The court may well disagree, but the en banc court must decide whether to overrule precedent, not us. *See Brown v. First Nat'l Bank in Lenox*, 844 F.2d 580, 582 (8th Cir. 1988).

The court concludes otherwise, but only because it disregards the standard of review and reads the complaint in the least charitable way possible. We are supposed to "draw[] all permissible inferences in [the plaintiffs'] favor," *Enter. Fin. Grp., Inc. v. Podhorn*, 930 F.3d 946, 949 (8th Cir. 2019), but the court does the opposite by declaring that "Sunday services and other religious activities" refers only to "activities at their respective churches," *ante* at 7. Who says? Certainly not the plaintiffs, which is why the court has to read their complaint so unnaturally. Indeed, read in the right light, it strongly suggests the opposite.

The phrase "other religious activities" could hardly be broader. Naturally read, especially when drawing all inferences in the plaintiffs' favor, it includes an array of activities, from bible studies and prayer groups to funerals and weddings, none of which lose their religious character simply because they happen somewhere other than a church. The mere fact that Sunday services typically take place in a church, in other words, does not mean that all "other religious activities" do too.

Moreover, the complaint describes the plaintiffs' injuries in general terms, rather than tying them to a specific location. For example, it explains how their "religious observance regularly and significantly entails joining in association with others to worship and pray and support one another and bear witness to and express their religious belief[s]." It then goes on to say that the stay-at-home order "discriminates against religious exercise" and interferes with their "right to pray and express their religious beliefs," "to pray corporately in a public setting," and "to peaceably assemble within their church communities and otherwise by means of and in connection with gatherings of more than 10 persons." Conspicuously absent in these allegations is any mention of a place or a building, which reasonably implies that the plaintiffs just wanted to get together with others to pray and discuss their religion, wherever they could. *See Enter. Fin. Grp.*, 930 F.3d at 949.

The court's contrary conclusion appears to be rooted in the complaint's reference to the plaintiffs' desire to "[a]ttend[] and participat[e] in worship and fellowship in their *church community*." (Emphasis added). A "community," regardless of whether it arises out of membership in a church, is a group of people, not a physical structure. *See The American Heritage Dictionary of the English Language* 374 (5th ed. 2016) (defining a "community" as "[a] group of people having common interests . . . [or] viewed as forming a distinct segment of society"); *Webster's Third New International Dictionary* 460 (2002) (explaining that a "community" includes "any group sharing interests or pursuits"). And "fellowship" can occur anywhere, not just at church. *See American Heritage Dictionary*, *supra*, at 648 (defining "fellowship" as "[t]he companionship of individuals in a congenial atmosphere and on equal terms" or "[a] close association of friends or equals sharing similar interests"); *Webster's Third*, *supra*, at 836 (noting that the term can also include the "mutual relation between members . . . of the same church").

To be sure, the complaint mentions specific facts about the plaintiffs' churches, including their seating capacities, the opportunities for social distancing, and the availability of hand sanitizer and other precautionary measures. But there are any number of reasons why the complaint might have spelled out those details. The most obvious, of course, is that the plaintiffs *prefer* to gather in church for religious activities. Another is that they thought it would be easier to show that religious activities could be safely conducted there. Or perhaps it just reflects the reality that *many* religious activities take place in church. Whatever the reason, none of these perfectly logical explanations lead to the inference the court draws: that the plaintiffs were challenging only their inability to gather for in-church activities. *See Enter. Fin. Grp.*, 930 F.3d at 949 (stating that we must "draw[] all permissible inferences in [the plaintiffs'] favor").

-20-

B.

Let's assume for a moment that the court's cramped reading of the complaint is correct, even though it should be clear by now that it is not. The court's conclusion that the plaintiffs lack standing to challenge the restrictions on in-church gatherings is a stretch too. To get there, it has to draw additional unfavorable inferences, particularly about causation and redressability. *See Liddell v. Special Admin. Bd. of the Transitional Sch. Dist. of the City of St. Louis*, 894 F.3d 959, 965 (8th Cir. 2018) (explaining that "in deciding a motion to dismiss" for lack of standing, "we accept as true the [plaintiffs'] allegations of injury, causation, and redressability").

Consider the court's reasoning. Like the district court, it believes the complaint had to rule out the possibility that the churches might have closed and remained shut on their own, even in the absence of the stay-at-home order. Given the uncertainty at the beginning of the pandemic, the theory goes, the churches themselves, not the stay-at-home order, may have actually caused the plaintiffs' injuries. *Bennett*, 520 U.S. at 169 (explaining that there is no standing when "the independent action of some third party not before the court" caused the injury (quotation marks and emphasis omitted)). If so, an injunction against the County would not have allowed the plaintiffs to resume their in-church activities.

The problem, of course, is that our review at this point is supposed to be "restrict[ed] . . . to the face of the pleadings." *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016) (quotation marks omitted). And here, there is not even a hint in the complaint that the churches would have *independently* imposed the same across-the-board attendance limits, and much to suggest they would not have. Otherwise, why discuss the fact that the churches had "ample space for" dozens of worshippers, even with "proper social distancing," and were already "equipped with hand sanitizers and other materials to enable visitors to observe appropriate hygienic precautions related to the COVID-19 situation"? Moreover, the fact that the

complaint emphasizes that worshipping with others is "an essential requirement of their sincerely held religious belief[s]" provides every reason to believe that the churches would have reopened for, at a minimum, smaller "gathering[s] of ten or more people."

***

There is no doubt the plaintiffs could have made our job easier by doing a better job of pleading their case. But they did all they needed to do to satisfy their "relatively modest" burden. *Bennett*, 520 U.S. at 171. Their "'general allegations' of injury, causation, and redressability," combined with the forgiving standard of review, are enough to conclude that they have standing. *In re SuperValu*, 870 F.3d at 773 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

III.

Once it gets past standing, the court goes on to tell us that even if the plaintiffs had it at one point, the moment has passed and the case is now moot. In the judicial universe, we call this a belt-and-suspenders approach. The problem for the court is that having tripped over its belt, it now gets tangled in its suspenders.

The Supreme Court has already laid out the template for addressing mootness in cases like this one. It has told us that, "even if the government withdraws or modifies a COVID restriction in the course of litigation," it "does not necessarily moot the case." *Tandon v. Newsom*, 141 S. Ct. 1294, 1297 (2021) (per curiam). The reason is the voluntary-cessation doctrine, under which a controversy only becomes moot if it is "absolutely clear" that the allegedly illegal activities "could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quotation marks omitted).

Whatever else we might be able to say about the pandemic, absolute clarity is not one of its features. The same goes for the County's response to it, which is presumably why it has repeatedly "reserved the right to" impose further restrictions in response to changing conditions. *Ctr. for Special Needs Tr. Admin., Inc. v. Olson*, 676 F.3d 688, 697 (8th Cir. 2012).

For proof, look no further than its public statements. Even as the County has lifted restrictions, it has reiterated its broad authority to "make ordinances, rules and regulations" it determines to be "necessary to protect the public health." Faisal Khan, St. Louis Cnty. Dep't of Pub. Health, 2019 Novel Coronavirus ("COVID-19") Reopen STL Order 1 (May 3, 2021), https://stlcorona.com/sites/default/assets/pdfs/dph-orders/reopenstl-050321.pdf; *accord, e.g.*, Faisal Khan, St. Louis Cnty. Dep't of Pub. Health, 2019 Novel Coronavirus ("COVID-19") Fifth Amended Safer At Home Order 1 (April 9, 2021), https://stlcorona.com/sites/default/assets/pdfs/dph-orders/Fifth-Amended-Safer-at-Home-040821.pdf. Indeed, before it was rescinded, the most recent order emphasized that "[a]dditional restrictions could be reinstated if there is a resurgence of the virus or strains on health system capacity." 2019 Novel Coronavirus ("COVID-19") Reopen STL Order, *supra*, at 2.

The resurgence is here. As one recent advisory put it, "Missouri has become a hotspot for COVID-19," which raises "risks to . . . residents . . . as the Delta variant becomes more widespread." St. Louis Cnty., *Saint Louis County Department of Public Health DPH Delta Variant Update* (July 12, 2021), https://stlcorona.com/news/health-advisory-071221; *see also* St. Louis Cnty., *St. Louis City and County to Require Masks to Limit Spread of COVID-19 Delta Variant* (July 23, 2021), https://stlcorona.com/news/st-louis-city-and-county-to-require-masks-to-limit-spread-of-covid-19-delta-variant (announcing a mask mandate to prevent "spikes that [could] overwhelm our hospital and public health systems" (quotation marks omitted)). If cases are rising and the County has publicly warned

us that further restrictions are possible, then how can it be "absolutely clear that the allegedly wrongful behavior could not reasonably" happen again? *Friends of the Earth*, 528 U.S. at 189 (quotation marks omitted).

Perhaps the answer lies in the court's novel theory that the County would not dare "flout the Supreme Court's intervening pronouncements on equal treatment between religious exercise and comparable secular activity." *Ante* at 13. Even setting aside that this theory conflates jurisdiction with the merits, *see Mata v. Lynch*, 576 U.S. 143, 150 (2015) (observing that the two questions are "of course distinct"), there is nothing to suggest that the prospect of losing in court would necessarily dissuade the County from trying again if the situation became dire enough, *cf. High Plains Harvest Church v. Polis*, 141 S. Ct. 527 (2020) (Kagan, J., dissenting) (failing to persuade a majority of the Court that a challenge to "capacity limits on worship services" was moot after the state "lifted all th[e] limits . . . in response to" the Supreme Court's developing COVID case law).

Besides, the court's assurance would be more comforting if it were based on anything the County had actually done or said. *See Phelps-Roper v. City of Manchester*, 697 F.3d 678, 687 (8th Cir. 2012) (en banc) (relying on the fact that a challenged ordinance had been "purposefully amended to correspond with [a judicial decision] in [an] emerging area of constitutional law"). Yet far from renouncing any intent to discriminate against religion, the County has used its merits brief in this case to *defend* its decision to single out religious activities. It has continued to argue that "participation in religious services and other spiritual practices was the only [e]ssential [a]ctivity with a deliberate purpose of (as opposed to potential incidental effect of) people assembling or gathering in groups." And rather than take the opportunity to finally set our minds at ease, the County simply dismissed the possibility that it might reimpose the challenged restrictions as "conjecture," which is exactly what the court does when concluding that the County would not dare try again. *See Friends of the Earth*, 528 U.S. at 213–14 (Scalia, J., dissenting)

(explaining that the voluntary-cessation doctrine is "an evidentiary presumption that the controversy . . . continues to exist," based on "skeptic[ism] that cessation of violation means cessation of live controversy").

The court is right about one thing. The past year has seen the welcome lifting of restrictions in St. Louis County and elsewhere. But although the pandemic has receded in places, it is not over, and eastern Missouri looks like it is set to face yet another wave. *See* St. Louis Cnty., *Saint Louis County Department of Public Health DPH Delta Variant Update*, *supra*; Daniel E. Slotnik & Noah Weiland, *Covid: Missouri Seeks Help from White House to Battle Outbreaks Driven by Delta Variant*, N.Y. Times (July 10, 2021), https://www.nytimes.com/live/2021/07/02/world/covid-19-vaccine-coronavirus-updates#missouri-covid-outbreak-team-delta-variant (describing "a surge in coronavirus cases and deaths" in Missouri because "vaccination rates are relatively low and the highly contagious Delta variant is more prevalent than in other states"). If it does, the County still holds sweeping powers that, by all indications, it is willing to use. I trust the County when it says it might change the rules again, which is why I am not ready to say that this case is moot. *See Friends of the Earth*, 528 U.S. at 190 (majority opinion).

IV.

This appeal presents hard questions, but we should have answered them long ago. Now we never will, which neither furthers religious freedom nor fulfills our judicial duty. *See Blue Moon Ent., LLC v. City of Bates City*, 441 F.3d 561, 565 (8th Cir. 2006) ("The loss of First Amendment freedoms, even for the period required to litigate a facial challenge, may constitute an irreparable injury."). The plaintiffs long ago alleged that St. Louis County "singled out religious services for special treatment in its fight against COVID-19," Judgment at 1, *In re Hawse*, No. 20-1920 (Stras, J., dissenting), and I would let them finally make their case. The court does not, so I respectfully dissent.

_____