# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
July 11, 2022

Lyle W. Cayce
Clerk

No. 20-40267

George Lee Tucker, II,

*Plaintiff—Appellant*,

*versus*

Steve Gaddis,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 6:14-CV-659

Before King, Graves, and Ho, *Circuit Judges*.
Per Curiam:

For years, the Texas Department of Criminal Justice ("TDCJ") has denied prisoner requests to hold religious gatherings for the Nation of Gods and Earths ("the Nation"). Originally, Texas denied such requests on the ground that it perceived the Nation as a racial supremacy group, and that allowing such an assembly would pose a security threat to the prison.

In response, Plaintiff George Lee Tucker II brought this suit against Steve Gaddis, TDCJ's Deputy Director of Volunteer Services and Special Populations, in the hope of vindicating the rights of the Nation's adherents

to congregate.  The suit was initially filed pro se over half a decade ago.  But Tucker began receiving the aid of pro bono legal counsel a few years later.

The State now says that it has promulgated a new policy to govern congregation requests on behalf of the Nation's adherents.  As a result, the State contends that this suit is now moot.

We disagree.  The new policy merely allows Tucker to *apply* for a congregation.  It does not in fact allow the Nation to congregate.  To the contrary, any such requests remain subject to "time, space, and safety concerns."  And to date, Texas has never permitted the Nation's adherents to congregate.  Nor is there any indication that Texas will allow them to do so anytime soon.  So this case is not moot.  Accordingly, we reverse.

## I.

Texas provides two types of communal religious services for inmates.  It allows an hour of weekly "primary" religious services through a TDCJ chaplain for members of ten recognized religious groups—Catholicism, Non-Roman Catholic Christianity, Islam, Sabbatarianism, Judaism, Native American religions, Neo-Paganism, Eastern Religion, Jehovah's Witnesses, and Mormonism.  In addition, adherents of these recognized religions can seek "secondary" services, led by an approved outside volunteer, subject to time, place, and security requirements as established by TDCJ's Religious Practices Committee.

For adherents of other religions not recognized by TDCJ, however, no primary religious services are permitted.  Inmates may only apply for secondary services.  But that is subject to the approval of the Committee and must be led by an outside volunteer director.

From 2007 to 2014, Texas categorized the Nation's adherents as members of the Islamic faith. As a result, they had access to primary Islamic religious services.

But that changed in 2014, when the Committee determined that the Nation is a racial supremacy group that would pose a security threat if allowed to congregate. Accordingly, the Committee removed the Nation from the Islamic category and refused to allow its members access to either primary or secondary services. So when Tucker applied for a secondary service in 2015, he was refused because of the Committee's categorical ban on the Nation's ability to congregate.

Tucker filed suit stating various claims, only one of which remains at issue in this appeal—a claim for a declaration that, under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), TDCJ must allow secondary services for the Nation. The district court assumed that the Nation is a "religion" for purposes of RLUIPA. The court then dismissed Tucker's claim for secondary services, finding TDCJ's ban on the Nation from congregating was the least restrictive means of maintaining security.

On appeal, this court vacated the judgment to the congregation claim, holding that there were genuine disputes of material fact as to "whether the state's ban: (1) advances a compelling interest (2) through the least restrictive means." *Tucker v. Collier (Tucker I)*, 906 F.3d 295, 302 (5th Cir. 2018). This court remanded the claim back to the district court.

While the case was on remand, the Committee again altered its policies with respect to the Nation. First, it once again categorized the Nation's adherents as members of the Islamic faith, thereby allowing them to participate in primary services. Second, it allowed members of the Nation to apply for secondary services subject to the same conditions as other faiths—it must obtain an approved volunteer, and the Committee must approve the

congregation based on time, venue, and security concerns. It also approved the receipt and acquisition of the Nation's literature and the celebration of the Nation's holy days.

After adopting the changes, TDCJ sought summary judgment on the grounds that Tucker's case was moot. TDCJ assured the district court that it had "no intention of revoking Tucker's religious rights" and detailed its affirmative efforts to help the Nation obtain secondary services. The district court dismissed Tucker's claim as moot, finding that TDCJ's changes were made in good faith.

## II.

"The doctrine of mootness arises from Article III of the Constitution, which provides federal courts with jurisdiction over a matter only if there is a live 'case' or 'controversy.'" *Dierlam v. Trump*, 977 F.3d 471, 476 (5th Cir. 2020) (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). "[A]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Id.* This court reviews questions of federal jurisdiction, including mootness, de novo. *Freedom from Religion Found. v. Abbott*, 955 F.3d 417, 423 (5th Cir. 2020).

To determine whether Tucker received relief from the change in policy, we consider his original demands in his complaint. Tucker's complaint was submitted pro se. "The filings of a pro se litigant are to be 'liberally construed' and a 'pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Coleman v. United States*, 912 F.3d 824, 828 (5th Cir. 2019) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)) (cleaned up).

TDCJ asserts that the crux of Tucker's claim is about eliminating the absolute ban on the Nation's ability to congregate. As TDCJ explains, its recent change in policy now allows Tucker to apply for secondary

congregations "subject to time, venue, and security concerns—the same conditions applied to other faiths." Thus, TDCJ argues that Tucker has received his desired relief given that the Nation is on the same footing as other religious groups.

But Tucker's original complaint does not merely seek an equal right to apply for secondary services. It asks for the "[a]ccommodation of the [Nation] with the provisions of scheduled time and venue for [the Nation's] assembly and practice." To date, Tucker and his fellow Nation adherents have not had the opportunity to congregate.

In response, TDCJ notes that there are no available external volunteers—a necessary requirement for secondary service. But at oral argument, counsel for TDCJ admitted that, even if Tucker could locate a willing volunteer, TDCJ could not guarantee congregation because such a request would still be subject to "time, space, and security concerns."

In other words, TDCJ's policy change gives Tucker nothing more than the right to *apply* for a congregation—to date TDCJ has never *approved* the Nation for congregation. And it is the latter that this suit seeks to obtain.

The Supreme Court has explained that "[t]he test for mootness in cases such as this is a stringent one." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 n.10 (1982). TDCJ bears the "heavy" burden of demonstrating mootness. *Pederson v. La. State Univ.*, 213 F.3d 858, 874 (5th Cir. 2000) (quotations omitted). "A case is not rendered moot simply because there is a possibility, or even a probability, that the outcome of a separate administrative proceeding may provide the litigant with similar relief." *El Paso Elec. Co. v. FERC*, 667 F.2d 462, 467 (5th Cir. 1982).

TDCJ claims that its policy change moots this case. But "[m]ere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave the defendant free to return to his old ways." *Aladdin's Castle*, 455 U.S. at 289 n.10 (cleaned up).

No. 20-40267

To be sure, "[a] case *might* become moot if subsequent events made it *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (emphasis added). But the government has not even bothered to give Tucker any assurance that it will permanently cease engaging in the very conduct that he challenges. To the contrary, as noted, counsel for TDCJ stated precisely the opposite during oral argument—TDCJ would *not* guarantee congregation in the future, but instead would reserve the question in light of potential "time, space, and security concerns." If anything, it is far from clear that the government has ceased the challenged conduct *at all*, let alone with the permanence required under the "stringent" standards that govern the mootness determination when a defendant claims voluntary compliance. For each of these reasons, this case cannot possibly be moot.

\* \* \*

We reverse and remand for further proceedings.

KING, *Circuit Judge*, concurring:

I concur. I agree that Tucker has not yet achieved the full relief he sought in his initial *pro se* complaint and that, therefore, this case is not moot. I write separately to dispel any implication that the TDCJ's current actions and policies are in error, especially if that implication is drawn from the TDCJ's statement (which was made at oral argument) that it "could not guarantee congregation because such a request would still be subject to 'time, space, and security concerns.'" *Ante*, at 5. Any consideration of how the TDCJ is applying its broadly applicable policies, which affect all inmates and every religious creed to which they belong, goes to the merits of Tucker's case and is beyond the scope of this appeal. Instead, Tucker's live claim must be considered in light of these global rules of engagement to ensure that they are being applied fairly and equally and are not being used as clandestine measures to renew a *de facto* form of the TDCJ's former categorical ban.

JAMES C. HO, *Circuit Judge*, concurring:

"Worthy civil rights claims are often never brought to trial." *Wearry v. Foster*, 33 F.4th 260, 278 (5th Cir. 2022) (Ho, J., dubitante). That's because government officials have a number of legal tools at their disposal to avoid being held accountable in the courts.

When a plaintiff seeks money damages, "an unholy trinity of legal doctrines—qualified immunity, absolute prosecutorial immunity, and *Monell* . . . —frequently conspires to turn winnable claims into losing ones." *Id.*

And if a plaintiff foregoes damages and asks for an injunction instead, public officials often try to evade trial by claiming the case is moot: Just stop engaging in the challenged conduct, declare that there's no need for an injunction, and see if enough compliant and deferential judges agree.

So no damages for past injury, due to immunity—and no injunction to stop future injury, due to mootness. Heads I win, tails you lose.

To be clear, it's not supposed to be this way. It shouldn't be that easy for the government to avoid accountability by abusing the doctrine of mootness. But judges too often dismiss cases as moot when they're not— whether out of an excessive sense of deference to public officials, fear of deciding controversial cases, or simple good faith mistake. And when that happens, fundamental constitutional freedoms frequently suffer as a result.

That's why legal commentators have bemoaned that acts of "strategic mooting litter the Federal Reporter." Joseph C. Davis & Nicholas R. Reaves, *The Point* Isn't *Moot: How Lower Courts Have Blessed Government Abuse of the Voluntary Cessation Doctrine*, 129 Yale L.J. Forum 325, 328 (2019). Because judicial acceptance of such gamesmanship "harm[s] both good sense and [] individual rights" and "depriv[es] the citizenry of certainty and clarity in the law" by "preventing the final resolution of important legal issues." *Id.*

I am thankful that our court does not make that same mistake today. But I continue to worry that judges may be tempted to misapply mootness in other cases—not to ensure that we decide only actual cases or controversies, but to avoid deciding cases that happen to be controversial.

Concerns about mootness abuse have been aired by an increasing number of members of the federal judiciary in recent years. *See*, *e.g.*, *N.Y. State Rifle & Pistol Association, Inc. v. City of New York*, 140 S. Ct. 1525, 1527 (2020) (Alito, J., dissenting, joined by Gorsuch, J., and by Thomas, J., in part); *Hawse v. Page,* 7 F.4th 685, 694 (8th Cir. 2021) (Stras, J., dissenting); *Resurrection School v. Hertel*, 35 F.4th 524, 531 (6th Cir. 2022) (en banc) (Readler, J., concurring in part and dissenting in part); *id.* at 532 (Bush, J., dissenting, joined by Siler and Griffin, JJ.).[1]

I write separately today to concur in their views, as well as in the views of my panel colleagues today.

## I.

Article III of the Constitution limits the judicial power to "cases" and "controversies." U.S. CONST. art. III, § 2. That means that the judiciary decides only "live" disputes—not moot ones. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013).

---

[1] Experienced public officials in the other branches of government have similarly sounded the alarm. In the FOIA context, for example, U.S. Senator John Cornyn has observed that, "when requestors [of information] [] sue agencies," the government often "withhold[s] documents . . . until the day before a judge's ruling," and then "send[s] a full box full of documents, render[ing] the lawsuit moot and leav[ing] the requestor with a hefty legal bill. And the agency gets away scot-free"—that is, liberated from paying attorneys' fees because the government's mootness strategy effectively deprives the plaintiff of prevailing party status for attorney fee purposes. 153 Cong. Rec. 22947 (2007). Congress subsequently enacted the OPEN Government Act of 2007 to correct this problem. Pub. L. No. 110-175, 121 Stat. 2524.

So if a case for whatever reason no longer presents a live controversy, we typically dismiss it as moot. But "if a case is on our docket and we have jurisdiction, we have an obligation to decide it." *N.Y. State Rifle*, 140 S. Ct. at 1528 (Alito, J., dissenting). "We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Cohens v. Virginia*, 19 U.S. 264, 404 (1821).

Accordingly, "a defendant cannot automatically moot a case," and thereby avoid judicial accountability, simply by "ending its unlawful conduct once sued." *Already*, 568 U.S. at 91. Indeed, it is settled law that "a defendant's voluntary cessation of a challenged practice does *not* deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) (emphasis added). A defendant may voluntarily abandon certain conduct, and that abandonment may be "an important factor bearing on the question whether a court should exercise its power to enjoin the defendant from renewing the practice." *Id.* "[B]ut that is a matter relating to the exercise rather than the existence of judicial power." *Id.*

That's not to say that voluntary cessation can *never* moot a case. But "subsequent events [must] make it *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." *Trinity Lutheran Church of Columbia, Inc., v. Comer*, 137 S.Ct. 2012, 2019 n.1 (2017) (cleaned up) (emphasis added). We must be certain that a defendant's voluntary acts are not mere "'litigation posturing'"—and that "the controversy is actually extinguished." *Yarls v. Bunton*, 905 F.3d 905, 910 (5th Cir. 2018).

This standard is strict because courts are naturally suspicious—or at least they *should* be—of officials who try to avoid judicial review by voluntarily mooting a case. The skepticism is warranted because the opportunities and incentives for government defendants are obvious: Any

"defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." *Already*, 568 U.S. at 91.

So we are "wary of attempts by parties to manufacture mootness in order to evade review." *N.Y. State Rifle*, 140 S. Ct. at 1533 (Alito, J., dissenting). *See also id.* at 1527 (courts should not "countenance[]" "manipulat[ion]" of mootness doctrine by government officials to avoid judicial review). We worry about the "typical case" in which "defendants may claim repentance and reform through voluntary action only to revert to their old ways upon dismissal of the suit." *Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 426 (5th Cir. 2013).

That's why the Supreme Court has repeatedly said that any defendant who invokes mootness based on voluntary compliance bears a "formidable burden." *Already*, 568 U.S. at 91 (quotations omitted). The standard for "determining whether a case has been mooted by the defendant's voluntary conduct is stringent." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189 (2000). Defendants bear a "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again." *Id.* (quotations omitted).

This burden is not insurmountable, to be sure. If a government not only ceases the challenged behavior, but also assures the plaintiffs and the courts that it will *never* return to its previous course of conduct, a court might reasonably decide to credit that promise, and hold the case moot, so long as it finds no reason to doubt the government's credibility on this score.

But if the government refuses to offer any such assurance, then the case can't be moot. That would defy Supreme Court precedent and make a mockery of the "stringent" and "formidable" burden that defendants are required to overcome in such cases.

It would also defy common sense.  President Reagan famously remarked that "the nine most terrifying words in the English language are 'I'm from the government and I'm here to help.'"  That sentiment may be too flippant for some.  But if a government official tells you that he is *not* here to help, even the sunniest optimist should side with the cynic.  When that happens, you best take the official at his word.

So I happily concur with the per curiam opinion.  The government's refusal to provide any assurance about its future conduct should foreclose any notion that this case is moot.  And of course we do not opine today on the merits of the religious liberty claims presented in this appeal—only that the claims deserve a full and fair airing, rather than summary dismissal.

## II.

In concurring, however, I am well aware that courts have not always followed this cautious approach to mootness.  Moreover, it's a problem that seems to recur with alarming frequency when it comes to religious liberty.

In a series of recent cases involving constitutional challenges to various COVID-19 policies, our sister circuits enabled public officials to avoid judicial review by dismissing the claims against them as moot—despite the fact that the officials refused to promise never to return to their challenged conduct.  *See Hawse,* 7 F.4th 685; *Resurrection School*, 35 F.4th 524.

To make matters worse, these officials not only gave no assurances— they went out of their way to reserve their right to revive their prior behavior at any time, as detailed in various dissenting opinions.  *See*, *e.g.*, *Hawse,* 7 F.4th at 699 (Stras, J., dissenting) (noting that the government "repeatedly 'reserved the right to' impose further restrictions in response to changing conditions"); *id.* at 700 ("far from renouncing any intent to discriminate against religion, the County has used its merits brief in this case to *defend* its

decision to single out religious activities"); *id.* ("I trust the County when it says it might change the rules again, which is why I am not ready to say that this case is moot."); *Resurrection School*, 35 F.4th at 532 (Readler, J., concurring in part and dissenting in part) ("[W]hen asked at oral argument whether the state would commit not to reenact its earlier mandate, the state's counsel bluntly responded: 'Absolutely not.'"); *id.* at 545 (Bush, J., dissenting) (noting that the government "conceded at oral argument that [it] could reinstitute its masking order 'on a moment's notice,' 'without the legislature,' 'on their own,' and 'without any other approval'").

In the face of this intransigence, the majorities preached deference to political officials in the administration of COVID-19 policy.  The majority in *Hawse* said that public officials could be trusted not to "flout the Supreme Court's intervening pronouncements on equal treatment between religious exercise and comparable secular activity."  7 F.4th at 693.  Similarly, the majority in *Resurrection School* invoked "defendants' own political accountability" to justify the withdrawal of judicial review.  35 F.4th at 529.

But when it comes to the protection of constitutional rights, our job is not to defer—it's to review.  Pandemic or not, it is the duty and function of the judiciary to ensure accountability of government under the Constitution and laws of the United States in all cases under Article III, both controversial and otherwise.  *See*, *e.g.*, *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020) ("[E]ven in a pandemic, the Constitution cannot be put away and forgotten.").  Our job in these cases is to verify, not trust.  *See*, *e.g.*, *Tandon v. Newsom*, 141 S. Ct. 1294, 1297 (2021) ("This is the fifth time the Court has summarily rejected the Ninth Circuit's analysis of California's COVID restrictions on religious exercise.").

So I agree with the dissenters in these cases:  Looking the other way when government claims mootness is an abdication of judicial duty, as well

as an affront to religious liberty.  Cases like these may no doubt "present[] hard questions." *Hawse,* 7 F.4th at 700 (Stras, J., dissenting).  But failing to answer the hard questions "neither furthers religious freedom nor fulfills our judicial duty." *Id.*  To the contrary, it "works an intolerable unfairness" for people of faith. *Resurrection School*, 35 F.4th at 552 (Bush, J., dissenting).  It's "disquieting" in the extreme to discover that "religious free exercise should hinge upon the caprice of the electorate," rather than on faithful enforcement by the judiciary. *Id.* at 547.  In a word, it's "indefensible." *Id.* at 552.

Moreover, these abuses are not limited to religious liberty.  Mootness manipulation can occur in any area where government regulates.  *See*, *e.g.*, *N.Y. State Rifle*, 140 S. Ct. 1525 (Second Amendment); *Wilderness Society v. Kane County*, 581 F.3d 1198, 1215 (10th Cir. 2009), *rev'd on other grounds*, 632 F.3d 1162 (10th Cir. 2011) (en banc) ("Kane County rescinded the Ordinance in a deliberate attempt to render the pending litigation moot, and it seems poised to reenact a similar ordinance.  We appreciate the commissioners' candor, but they cannot so easily moot environmental plaintiffs' claims.").

With the circuits apparently divided on these questions, it will require action from the Supreme Court to get things back on track.

\* \* \*

Substantive rights are meaningless if we don't enforce procedural rules properly.  *Cf.* Steven S. Smith et al., The American Congress 222 (9th ed. 2015) ("If I let you write the substance and you let me write the procedure, I'll screw you every time.") (quoting Rep. John Dingell).  We cannot allow government officials to unilaterally avoid judicial review—and especially not when they openly admit that their change in behavior is strategic rather than sincere.  I concur.