# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 18, 2022

Lyle W. Cayce
Clerk

No. 21-11159

DAVID SAMBRANO, *on their own behalf and on behalf of all others similarly situated*; DAVID CASTILLO, *on their own behalf and on behalf of all others similarly situated*; KIMBERLY HAMILTON, *on their own behalf and on behalf of all others similarly situated*; DEBRA JENNEFER THAL JONAS, *on their own behalf and on behalf of all others similarly situated*; GENISE KINCANNON, *on their own behalf and on behalf of all others similarly situated*; SETH TURNBOUGH, *on their own behalf and on behalf of all others similarly situated*,

*Plaintiffs—Appellants*,

*versus*

UNITED AIRLINES, INCORPORATED,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:21-CV-1074

ON PETITION FOR REHEARING EN BANC

Before SMITH, ELROD, and OLDHAM, *Circuit Judges*.

PER CURIAM:

Treating the petition for rehearing *en banc* as a petition for panel rehearing, the petition for panel rehearing is DENIED. *See* `5th Cir. R. 35

I.O.P.  The petition for rehearing *en banc* is DENIED because, at the request of one of its members, the court was polled and a majority did not vote in favor of rehearing.  Fed. R. App. P. 35; 5th Cir. R. 35.

In the en banc poll, four judges voted in favor of rehearing (Judges Smith, Higginson, Costa, and Willett), and thirteen judges voted against rehearing (Chief Judge Richman and Judges Jones, Stewart, Dennis, Elrod, Southwick, Haynes, Graves, Ho, Duncan, Engelhardt, Oldham, and Wilson).

In addition, United's motion to dismiss the appeal and vacate the panel opinion is DENIED.

JAMES C. HO, *Circuit Judge*, concurring in denial of rehearing en banc:

Imagine that your employer suddenly declares that he finds one of your religious beliefs offensive. It could be your view on abortion, or marriage, or sexuality, or gender, or any number of other religious tenets. Your view has no economic impact whatsoever on the company. But it offends the sensibilities of the executives who populate the C-suite.

So the company puts you on unpaid leave for an indefinite period of time. And the *only* way you can reclaim your job is to abandon your religious convictions—and to do so irreversibly.

Imagine further that you love your God—and you also love your family, who counts on you and your livelihood to survive.

Finally, imagine that, if you can't get preliminary injunctive relief, you'll have no choice but to sacrifice your faith, in order to avoid sacrificing your family.

Now ask yourself this question: What measure of damages would make you whole? Put another way: For how much would you sell your soul?

If the very thought of this question vexes or offends you, you're not alone. For millions of Americans, you'd be hard-pressed to come up with a more obvious and compelling example of an incalculable, irreparable injury.

\* \* \*

As the district court noted, the facts of this case are "disturb[ing]." *Sambrano v. United Airlines, Inc.*, 570 F. Supp. 3d 409, 420 (N.D. Tex. 2021).

United Airlines ordered all of its employees to obtain a COVID-19 vaccine—notwithstanding the fact that some of them have sincere religious objections that the vaccines were developed using aborted fetal issue.

Notably, United chose not to fire employees who refused the vaccine, but instead put them on indefinite unpaid leave, and made clear that the only way they could return to their jobs was to be vaccinated. It did so for one simple reason: to coerce its employees into violating their religious beliefs—and what's worse, to do so irrevocably and permanently.

There is no legitimate business justification for this action. It could not have been customer or employee safety, as United suggests. To the contrary, "[t]he record shows, as United has often touted, that the risk of catching COVID on its airplanes is infinitesimally low, with or without a vaccine. . . . [S]ome 99% of United's employees are already vaccinated." Oral Arg. at 7:48–8:04. Moreover, "there's evidence . . . below showing that United's CEO deliberately set out to coerce employees with religious scruples against the vaccine into violating those beliefs. And when you put all those facts together, it could not have been for purposes of safety. . . . [T]hat was pretextual." *Id.* at 8:04–8:31. As Plaintiffs contend, the real reason for the vaccine mandate and indefinite unpaid leave policy is "virtue signaling" and "currying political favor." *Id.* at 8:35–8:39.

So the plaintiffs filed suit under Title VII of the 1964 Civil Rights Act, among other things, and sought preliminary injunctive relief. The district court denied such relief for one simple reason—lack of irreparable injury.

I disagree with that holding, and I wrote as much in my dissent at the motions stage in this appeal. *See Sambrano v. United Airlines, Inc.*, 19 F.4th 839, 839 (5th Cir. 2021) (Ho, J., dissenting). So I was pleased when the panel majority at the merits stage of this appeal reached the same conclusion that I did—that being pressured into violating one's faith is an obvious irreparable injury. *See Sambrano v. United Airlines, Inc.*, 2022 WL 486610 (5th Cir. Feb. 17, 2022) (per curiam).

I concur in the denial of rehearing en banc.  I write separately to explain why, contrary to the dissent, the panel majority's irreparable injury analysis is a relatively straightforward matter to defend.

**I.**

Being placed on indefinite unpaid leave because your employer doesn't like your religious beliefs is obviously an adverse employment action and an actionable claim under Title VII of the Civil Rights Act of 1964.  And you've obviously suffered irreparable injury when you're forced to violate your faith in order to get your job back.

The injury would be entirely reparable by money damages if it was just about a loss of money.  But it's not.  It's about a loss of faith.  And it's about a crisis of conscience.  You're being coerced into sacrificing your faith in order to keep your job.

No measure of damages makes sense in this scenario.  To keep your job, you must violate your faith.  How much money would it take for you to sell out your faith?

To ask the question is to answer it.  It seems obvious that violations of conscience are classic irreparable injuries.  That's why violations of the First Amendment have long been deemed irreparable.  As the Supreme Court has held for decades, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.).  *See also*, *e.g.*, *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam) (same).

Yes, we all know that the First Amendment governs government entities, not private corporations.  But it seems obvious that the *reason* that First Amendment injuries are irreparable is not because it's inflicted by the

government rather than business. It's because the very nature of religious belief is spiritual, rather than pecuniary.

The panel dissent disagrees. It claims that First Amendment violations are uniquely irreparable because they involve the government and the Constitution. "[C]onstitutional violations work a different harm. Government exists to protect and uphold the Constitution. When government exceeds the consent of the governed to deny the rights it has sworn to protect, that betrayal is a unique, freestanding, and immeasurable injury." *Sambrano*, 2022 WL 486610, at *24 (Smith, J., dissenting).

But the panel dissent cites no judicial authority to support this proposition. And for good reason.

To begin with, many courts, including our own, have applied the same irreparable injury analysis to *statutory* intrusions on religious liberty— including Title VII.

Take, for example, our decision in *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279 (5th Cir. 2012). There we applied *Elrod* to a federal statute, the Religious Land Use and Institutionalized Persons Act (RLUIPA). We said that *Elrod* "applies with equal force to the violation of RLUIPA rights because RLUIPA enforces First Amendment freedoms, and the statute requires courts to construe it broadly to protect religious exercise." *Id.* at 295. Likewise, under the Religious Freedom Restoration Act (RFRA), "courts have recognized that this same [*Elrod*] principle applies." *Id.* (quoting *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001)) ("[C]ourts have held that a plaintiff satisfies the irreparable harm analysis by alleging a violation of RFRA."). *See also Jolly v. Coughlin*, 76 F.3d 468, 482 (2nd Cir. 1996) ("[A]lthough the plaintiff's free exercise claim is statutory rather than constitutional, the denial of the plaintiff's right to the free exercise of his

religious beliefs is a harm that cannot be adequately compensated monetarily.").

These same principles readily apply to Title VII's prohibition on religious discrimination. As we've observed, Title VII was "intended to protect the same rights in private employment as the Constitution protects." *Riley v. Bendix Corp.*, 464 F.2d 1113, 1116 (5th Cir. 1972) (quotations omitted). "At the risk of belaboring the obvious, Title VII aimed to ensure that employees would *not* have to sacrifice their jobs to observe their religious practices." *Adeyeye v. Heartland Sweeteners*, 721 F.3d 444, 456 (7th Cir. 2013).

So there's no basis for drawing a distinction between constitutional and statutory violations.

Nor is there any basis to draw the distinction based on what kind of entity—government or private—caused the injury.

To begin with, it's just standard-fare preliminary injunction law that we look to the impact on the plaintiff, not the identity of the defendant, to determine whether an injury is irreparable. "Plaintiffs are entitled to a preliminary injunction if they show . . . a substantial threat that *they*"—meaning, the plaintiffs—"will suffer an irreparable injury if the injunction is not granted." *Doe I v. Landry*, 909 F.3d 99, 106 (5th Cir. 2018) (emphasis added).

To be sure, we might think of government as different from private entities to the extent that government uniquely exercises the coercive power of the state. But that distinction doesn't do any analytical work here. Just look at the canonical case in this area: *Elrod* is a government employment case—not a government coercion case. *See* 427 U.S. at 349–51. So *Elrod* shows that public employers can inflict irreparable injury without using the

coercive power of the state—but rather the power of the paycheck. And private employers quite plainly have that same power, too.

All of this seems straightforward. And indeed, the Supreme Court has recently confirmed it. As the Court explained, this kind of injury is irreparable for the simple reason that the harm is "spiritual rather than pecuniary." *Ramirez v. Collier*, 595 U.S. _, _ (2022). So "[c]ompensation . . . would not remedy this harm." *Id.*

To millions of people of faith—including the members of the Supreme Court—it's painfully obvious that there's no way to calculate damages to compensate for the loss of one's soul.

## II.

Irreparable injury is the only reason that the district court gave for denying preliminary injunctive relief. *See Sambrano*, 570 F. Supp. 3d at 419. So I would have reversed on that ground alone, and remanded for further proceedings accordingly.

As we have repeatedly observed, we are a court of review, not first view. It's not an absolute rule, to be sure—we may also affirm on the basis of any ground available in the record. But it's a view I've tried to adhere to, absent compelling reason to do the contrary. I've done so in a number of cases—including under Title VII.[1]

---

[1] *See*, *e.g.*, *Wantou v. Wal-Mart Stores Texas, L.L.C.*, 23 F.4th 422, 442 (5th Cir. 2022) (Ho, J., concurring in part and dissenting in part) ("I would not affirm on alternative grounds not reached by the district court in the first instance, nor addressed by Wantou in his pro se brief on appeal—namely, whether Wal-Mart took prompt remedial action to redress the situation in a manner sufficient to avoid liability under Title VII. That is an issue that should be decided in the first instance by the district court, if not by a jury."); *Abraugh v. Altimus*, 26 F.4th 298, 306 (5th Cir. 2022) ("We decline to address these issues for the first time on appeal, and instead leave them for the district court to resolve on remand."); *Frederking v. Cincinnati Ins. Co.*, 929 F.3d 195, 200 n.2 (5th Cir. 2019) ("The

I see no reason to depart from that view here. The dissent objects that plaintiffs are not even authorized to obtain preliminary injunctive relief under Title VII in the first place. But the district court didn't address that issue.

Moreover, the dissent acknowledges that such relief is available under *Drew v. Liberty Mutual Insurance Company*, 480 F.2d 69 (5th Cir. 1973). *See Sambrano*, 2022 WL 486610, at *14 (Smith, J., dissenting) (*Drew* "recognize[d] the right of individual employees to seek preliminary injunctions in Title VII cases"); *post*, at 16 (similar).

The dissent nevertheless insists that *Drew* was wrongly decided. *See post*, at 16–17. So it urges us to take this case en banc to overrule *Drew*.

It's obviously the prerogative of the en banc court to reconsider and overrule circuit precedents. But I see no need to do so here, especially when the issue hasn't been addressed by the district court in this case.[2]

## III.

The panel dissent makes two additional points that warrant a brief response.

First, it opens by accusing the panel majority of usurping the prerogative of corporate executives to decide how best to run their companies. *See Sambrano*, 2022 WL 486610, at *10 (Smith, J., dissenting) (criticizing the majority's "alacrity to play CEO of a multinational

---

district court did not reach these issues. We decline to address them for the first time on appeal.").

[2] During oral argument in this appeal, the dissenting judge accused the district court of unfairly "thr[owing] in some cheap shots" and "poison[ing] the well" simply by exploring issues other than irreparable injury. Oral Arg. at 15:05–15:20.

corporation"). The message is apparently this: Judges ought to be more deferential to corporate prerogatives. Like the panel majority, I disagree.

Corporations are not people. But like people, corporations are capable of following the law as well as violating it. Moreover, by combining and coordinating human efforts, corporations can do a lot more. They can have a greater impact on society than most individuals. As a result, corporations can achieve far greater good—and cause much greater harm.

So when corporations violate the law, courts should hold them accountable, no less and no more than individuals. *See*, *e.g.*, Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 352–53 (2012) ("'Is it good for business?' . . . Questions like these are appropriately asked by those who write the laws, but not by those who apply them.").

Second, the panel dissent accuses the majority of granting an "unprecedented" form of preliminary injunctive relief, never before granted in Title VII religious liberty cases. *Sambrano*, 2022 WL 486610, at *28 (Smith, J., dissenting) (accusing majority of engaging in "an unprecedented intrusion into the management of a private business"). *See also id.* at *15 (criticizing majority for theorizing that "this circumstance has never occurred before in the history of man").

If the dissent is right, and this case is indeed pathbreaking, it's important to understand why. What's new here is not the law, but the behavior of industry.

Historically, corporations typically focus on increasing shareholder value—not on imposing certain cultural values on others. But that is rapidly changing.

I began by imagining a hypothetical employer who doesn't care how productive an employee you might be—he insists that you abandon certain religious beliefs he finds offensive, whether it's abortion, marriage, sexuality, gender, or something else.

But here's the thing: What was once hypothetical is now rapidly becoming reality. Examples of this abound. *See*, *e.g.*, Douglas Blair, *12 People Canceled by the Left After Expressing Conservative Views*, HERITAGE FOUNDATION, Sep. 20, 2021; Mark A. Kellner, *Former Atlanta fire chief, fired for views on marriage, to aid other 'cancel culture' victims*, WASH. TIMES, Oct. 8, 2021; Adam Sabes, *Columbia University employees can be dismissed for using wrong pronouns*, FOX NEWS, Nov. 8, 2021; Bianca Quilantan, *Legal fights over pronouns may thwart Cardona's plan to help trans students*, POLITICO, May 25, 2022; Audrey Conklin, *Southwest flight attendant awarded $5M after firing over abortion stance*, FOX BUSINESS, July 15, 2022.[3]

So this case may be the first, but I suspect it will not be the last.

\* \* \*

A prominent commentator and former CEO recently expressed "deep[] concern[]" about this "new model of capitalism," calling it "a dangerous expansion of corporate power that threatens to subvert American democracy." VIVEK RAMASWAMY, WOKE, INC.: INSIDE

---

[3] This dynamic has also begun to harm the legal profession and its traditional and essential role in our adversarial system of justice. *See*, *e.g.*, Aaron Sibarium, *The Takeover of America's Legal System*, SUBSTACK, Mar. 21, 2022 ("Law firms also worry about losing their corporate clients, which . . . have grown more stridently ideological in recent years. . . . 'It doesn't even occur to people to take controversial cases,' one lawyer in Washington, D.C., said. Religious liberty cases, for example, are 'totally off the table. I wouldn't even think to bring it up.'"). *See also Lefebure v. D'Aquilla*, 15 F.4th 670, 675 n.1 (5th Cir. 2021); Eugene Scalia, *John Adams, Legal Representation, and the "Cancel Culture"*, 44 HARV. J.L. & PUB. POL'Y 333 (2021).

CORPORATE AMERICA'S SOCIAL JUSTICE SCAM 18 (2021). As he explained, "America was founded on the idea that we make our most important value judgments through our democratic process, where each citizen's voice is weighted equally, rather than by a small group of elites in private. Debates about our social values belong in the civic sphere, not in the corner offices of corporate America." *Id.* at 18–19. "[T]here's a difference between speaking up as a citizen and using your company's market power to foist your views onto society while avoiding the rigors of public debate in our democracy." *Id.* at 19. "When companies use their market power to make moral rules, they effectively *prevent* . . . other citizens from having the same say in our democracy." *Id.*

In sum, "it's the Goldman Rule in action. *The guys with the gold get to make the rules.*" *Id.* at 18.

Not surprisingly, many Americans bemoan the impact that this new form of capitalism is starting to have on our Nation's culture. *Cf. Oliver v. Arnold*, 19 F.4th 843, 843–44, 853–54 (5th Cir. 2021) (Ho, J., concurring in denial of rehearing en banc); *Villarreal v. City of Laredo*, _ F.4th _, _–_ (5th Cir. 2022) (Ho, J., concurring).

My point today is less ambitious: We know what this new corporate trend is doing to employees. It's violating the religious convictions of workers across the country. And in cases like this, the injuries are irreparable.

So unlike the dissent, I'm grateful that our court is taking the action it is today. And unlike the dissent, I don't think our circuit will be alone, as cases like this inevitably multiply across the country, assuming corporate trends persist.

But if our circuit turns out to be alone in its defense of religious liberty, I'll be grateful for our actions today all the same. *Cf. Tucker v. Gaddis*, 40 F.4th 289, 296–97 (5th Cir. 2022) (Ho, J., concurring) (noting circuit split

over misuse of mootness doctrine to avoid judicial review of religious liberty and other claims).

I concur in the denial of rehearing en banc.[4]

---

[4] As for any concern about "the integrity of this court's decisionmaking process," *post*, at 14, I'll say this much:  I certainly agree that no member of this court should violate our rules governing the publication of opinions.  I agree that such tactics can be abused by rogue panels that seek to distort the law.  And I agree that rehearing en banc may serve as an important check against such rogue panels.  But as for this particular case, I'm not too troubled.  Because I don't think this panel went rogue—I think this panel got the law right.

JERRY E. SMITH, *Circuit Judge*, dissenting from the denial of the petition for rehearing en banc:

The passions engendered by the public debate over COVID vaccinations should not drive this court's decisions in cases large or small. My faith in this court's integrity reassures me that no such thing has happened here. Still, I despair at my well-intentioned colleagues' decision and its implications for this court and its precedents. I respectfully dissent.

I have two broad areas of concern, and I struggle to identify which is more significant. One involves the misapplication of an important federal statute and the muddling of Fifth Circuit precedent. The other implicates the integrity of this court's decisionmaking process. I flip a coin and begin with the former.

## I.

The panel majority's opinion[1] mutilates Title VII. It declares that Title VII plaintiffs no longer must exhaust with the EEOC before suing. The majority permits, for the first time under the current statute, private Title VII plaintiffs to get preliminary injunctions. It rewrites the law of irreparable harm to accommodate non–Title VII injuries.[2] It invents a new Title VII sin that it calls "ongoing coercion."[3] And it resurrects a forty-nine-year-old Fifth Circuit decision that the Supreme Court long ago relegated to the

---

[1] 2022 WL 486610, 2022 U.S. App. LEXIS 4347 (5th Cir. Feb. 17, 2022) (unpublished).

[2] 2022 WL 486610, at *7 (allowing relief for a supposed injury that is "antecedent to, independent from, and exogenous to any adverse employment action").

[3] *Id.* at *9 ("[W]hen an employee is subjected to ongoing coercion because of a protected characteristic, the irreparable harm factor of the preliminary injunction analysis is satisfied.").

dustbin[4]—while discarding a more recent decision that has been cited about three hundred times.[5]

Regrettably, the full Fifth Circuit has chosen to avoid an easy fix: Rehear this case en banc, clarify that *Drew* has been overruled, and reconcile the new conflicts in our caselaw.

I will not burden the reader by restating the numerous reasons the court should have done that.[6] A thumbnail sketch is good for now.

\* \* \* \* \*

The majority erases some of Title VII's most important limitations.

*First*, Title VII does not authorize private plaintiffs to seek injunctions. Congress empowered only the EEOC and, in some cases, the Attorney General, to do that. 42 U.S.C. § 2000e-5(f)(2). It gave private plaintiffs many other remedies—but not preliminary injunctions. *E.g.*, § 2000e-5(g)(1). Things not enumerated are excluded, so preliminary injunctions aren't allowed. Yet the majority breaks with this longstanding prohibition in allowing these plaintiffs to seek an injunction.

*Second*—as if that wasn't bad enough: The majority permits the motion for preliminary injunction to proceed even though the plaintiffs have not exhausted. Title VII requires plaintiffs to exhaust their claims with the EEOC before even suing their employers. That limitation, § 2000e-5(f)(1), is stern and absolute.

The majority demolishes both of those barriers by exhuming *Drew*.

---

[4] *Drew v. Liberty Mut. Ins. Co.*, 480 F.2d 69 (5th Cir. 1973).

[5] *White v. Carlucci*, 862 F.2d 1209 (5th Cir. 1989) (Smith, J., joined by Politz and King, JJ.).

[6] *See Sambrano*, 2022 WL 486610, at \*10–37 (Smith, J., dissenting).

This court had not cited—much less followed—that case since the Eleventh Circuit split from the Fifth more than forty years ago.[7]  *Drew* wrongly reasoned that federal courts have the power to "fashion an equitable remedy to vindicate" Title VII's purposes, including preliminary injunctions.  480 F.2d at 73.  Obliterating the exhaustion requirement required the majority to extend *Drew* even beyond its original holding.[8]

Both of the panel majority's anachronistic delusions have long since been repudiated—by this court and the Supreme Court.  In *White*, 862 F.2d at 1211–12, this court recognized that Title VII's text precludes private plaintiffs from seeking preliminary relief.  And "even if we were to read [the statute] as authorizing this injunction, [the] plaintiff still has not exhausted his administrative remedies."  *Ibid.*  Apparently *White* now takes *Drew*'s place in history's dustbin.

In *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001), the Court put an end to the "*ancien regime*" where judges created new remedies to effect statutory objectives.  And in *Ross v. Blake*, 578 U.S. 632 (2016), the Court did the same for judge-made exceptions to statutory exhaustion requirements.  One might have expected more fidelity to those textualist decisions from textualist judges.

The majority claims to be bound to *Drew* by the rule of orderliness. That claim beggars belief, but even if it were right, that wouldn't have stopped the en banc court:  It could quickly and easily have put *Drew* back in its grave.

To make matters worse, the majority excuses these plaintiffs even

---

[7] *See Middleton-Keirn v. Stone*, 655 F.2d 609, 611–12 (5th Cir. Unit B Sept. 1981).

[8] *Sambrano*, 2022 WL 486610, at *5 & n.10.

from showing that their injury is *covered by Title VII*. To succeed on the plaintiffs' discrimination theory, we have required legions of plaintiffs to show an adverse employment action—no easy feat.[9] By fabricating a new facet of Title VII—one that forbids employers from making employees choose lest the employers be seen as engaging in "ongoing coercion"[10]—the majority fancies that it has found something "different"[11] from the other judges who have confronted this mundane issue.

Of course that's not accurate. The majority's theory just restates a notion that the Supreme Court disclaimed in *Sampson v. Murray*, 415 U.S. 61, 90–92 & 92 n.68 (1974). The High Court said that "loss of income . . . falls far short of the type of irreparable injury" required for an injunction to issue. *Id.* at 91. That's true no matter how "severely [financial pressures] may affect a particular individual." *Id.* at 92 n.68.

Calling it an "impossible choice" obscures the *reason* these plaintiffs have to choose: Just like all the other plaintiffs whose injuries we deem reparable, these plaintiffs don't want to lose their incomes. Consider the way the plaintiffs describe their "ongoing harm":

> [A]s Sambrano and Kincannon were preparing to return to work after months of unpaid leave, United [prevented them] from working many of the most lucrative flight routes that they had worked before. . . . [United's vaccine policies] will cost

---

[9] *E.g.*, *Lindsley v. TRT Holdings, Inc.*, 984 F.3d 460, 470 (5th Cir. 2021); *Wright v. Union Pac. R.R.*, 990 F.3d 428, 433 (5th Cir. 2021); *Thompson v. City of Waco*, 764 F.3d 500, 503 (5th Cir. 2014). Other Title VII theories, such as those based on a hostile work environment, do not require an adverse employment action. *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 (5th Cir. 1999); *Dediol v. Best Chevrolet, Inc.*, 435 F.3d 443 (5th Cir. 2011). But the plaintiffs never pleaded such a theory.

[10] *Sambrano*, 2022 WL 486610, at *3.

[11] *Id.* at *9.

Sambrano substantial income every flight he takes—solely because of his adherence to his religious beliefs. . . .

[T]he lucrative flight routes are available for employees who have received the COVID-19 vaccine, and the substantially less lucrative routes are available for those with religious beliefs that conflict with receiving the vaccine. That imposes the same kind of coercion that the panel held constitutes irreparable injury: forcing employees to either lose "pay and benefits" or "violate their religious convictions."

Dkt. No. 160 at 3–6 (quoting *Sambrano*, 2022 WL 486610, at *9).

That passage cuts to the heart of the majority's thesis: Financial pressures constitute irreparable injury if the plaintiff could choose to avoid them. That theory thumbs its nose at fifty years of precedent holding that injuries are reparable where damages may make the plaintiff whole. And without *irreparable* injury, no preliminary injunction can lie.

In sum, the panel majority upsets the careful balance that Congress struck to enact Title VII. The en banc court should have corrected the panel's mistake.

## II.

Somehow, all that destruction of our (and the Supreme Court's) case-law might not be the worst consequence of the court's decision. The fact is that if the panel majority had followed our rules and published its opinion, the whole court would have been more inclined to rehear this case en banc. But that is quite likely why the panel majority made its decision: It wanted to reduce the chance that its opinion would be vacated for rehearing en banc.[12]

---

[12] The majority points out that I could have insisted that the opinion be published. 2022 WL 486610, at *1. Indeed I could have—and of course I didn't. As bad as this situation is, it would be much worse if the opinion were published and binding on all future Fifth Circuit panels. My decision not to stake everything on en banc review is beside the point.

That surmise is inevitable given the panel's vapid explanation for non-publication. It says only that its decision is "interlocutory, decides nothing on the merits, and answers only the irreparable-injury question asked by the district court."[13]

The majority's three holdings are dramatic and unprecedented, and the law it applies was mysteriously unknown to the talented district judge[14] and to two of our distinguished colleagues on the motions panel.[15] How could it be that a key component of the law governing federal courts' "awesome power"[16] to order litigants around does not "in any way interest persons other than the parties to [this] case"?[17]

In my panel dissent, I examine the ten disjunctive factors our rules

---

The question the panel majority cannot answer is this: If it believes its holdings are correct, why does it disregard our rules?

[13] *Ibid.* That—to put it politely—is false. In the first place, we routinely publish opinions on interlocutory appeals, a common example being appeals of the denial of qualified immunity, not to mention appeals, such as this one, permitted under 28 U.S.C. § 1292(a)(1), as well as appeals per § 1292(b). Even the *motions* panel in this case published its opinion. *See Sambrano v. United Airlines, Inc.*, 19 F.4th 839 (5th Cir. 2021).

Secondly, as for addressing only irreparable injury, the majority conveniently forgets what it says a few pages later: "In this appeal we address only the [irreparable injury] factor. But before doing so, we must address the broader issue whether a preliminary injunction is ever available to plaintiffs suing private employers under Title VII. *We hold that it is.*" 2022 WL 486610, at *4 (emphasis added). That is a broad, generally applicable holding that, if published, would have bound future panels not only selectively as to United and its employees but also as to all other Title VII parties.

[14] *Sambrano v. United Airlines, Inc.*, 570 F. Supp. 3d 409, 414–16 (N.D. Tex. 2021).

[15] *See Sambrano*, 19 F.4th at 839.

[16] *FTC v. OKC Corp.*, No. 29974, 1970 WL 2787, at *5 (5th Cir. July 8, 1970) (Clark, J., dissenting).

[17] 5TH CIR. R. 47.5.1.

provide; I show that those requisites cry out for publication here.[18]  I won't restate that analysis except briefly to mention one damning factor:  If *Drew*'s vitality was not, at least, "an existing rule of law that appears to have been generally overlooked,"[19] why didn't the district court or the motions panel notice that?

The en banc court's imprimatur works chaos on the decisionmaking process.  In our common-law tradition, one opinion should build on another.  To avoid chaos and rogue decisionmaking, every published opinion is precedent that binds future Fifth Circuit panels and our district judges.  None of us can depart from Fifth Circuit precedent just because we think it wrong, unworkable, or unwise.  Our orderly process depends on careful—self-imposed—discipline that our judges conscientiously observe.

The decision whether to publish is absolutely critical to the integrity of that process.  For reasons that I won't take the time to explain, this court decided that unpublished opinions released in or after 1996 would not be precedential.[20]  It makes some sense not to clutter reporting services with routine opinions that decide nothing new and affect only the immediate parties.

That change generated considerable discussion.  Along with a few other judges, I opposed that amendment even though, by then, all other circuits had chosen that path.  We detractors warned, *inter alia*, that it would be too easy for any given panel majority to avoid the consequences of its decision—regardless of its importance—merely by adding the customary "do-not-publish" footnote.  That way, a panel would feel comfortable declaring the winner without worrying about how doing so might affect future cases.

---

[18] *Sambrano v. United Airlines, Inc.*, 2022 WL 486610, at *35–36.

[19] 5TH CIR. R. 47.5.1(a).

[20] 5TH CIR. R. 47.5.1.

Or, for much the same reason, a panelist might condition his or her concurrence on making the opinion unpublished.

Our concern was prescient. As I say in my panel dissent, the "obvious result" of the majority's decision is to foster today's "'Blue Plate Special' cause" without committing to sweeping legal changes that may not always produce the same outcomes.[21] This "'one and done' method of decision-making"[22] is made possible only by abusing the availability of unpublished opinions—a device that the full court has now fully validated by denying rehearing.

Consider the striking irony: In supposed honor of the integrity of the common-law tradition, a panel majority insists on a fastidious application of the rule of orderliness to apply a long-forgotten Fifth Circuit opinion. In doing so, the majority apparently overrules countless Title VII cases whose panels assiduously adhered to what they thought our precedent required. But that same panel majority abandons that well-established method of decisionmaking by announcing a major, groundbreaking opinion in a way designed to affect only the immediate parties to the case.

And by a lopsided vote, the en banc court declines to lift a finger. After today, a future panel that wishes to use the "one and done" method of decisionmaking can feel more secure in thinking there will be no consequences.

\* \* \* \* \*

To see what all of this means, imagine that you're a conscientious district judge in the Fifth Circuit and that you're dedicated to following precedent carefully. Into your court comes a Title VII plaintiff who seeks an

---

[21] 2022 WL 486610, at *36.

[22] *Ibid.*

injunction but hasn't exhausted. Moreover, he claims "ongoing coercion" independent of any Title VII injury. Relying on *Sambrano*, he says *Drew* now means that (1) he need not exhaust with the EEOC; (2) he can get a preliminary injunction or any other remedy needed to effect Title VII's purposes; and (3) and such a remedy can be based on non-Title VII injury. The employer, in turn, relies on *White v. Carlucci*, *Sampson v. Murray*, and decades of precedent applying those cases.

As the district judge, what are you to do?

*Sambrano* is unpublished, and *Drew* has been disregarded a thousand times over. So you might punt by ignoring those decisions. But you would be telling two well-respected circuit judges that their lengthy and detailed opinion is only an ink blot despite having resolved an important dispute between a major international corporation and its employees. "Maybe I'll draw a favorable Fifth Circuit panel," you tell yourself, as you dismiss the complaint for failure to exhaust. "They can't make me abide by *Sambrano* because, thank God, it's unpublished."

Or you can apply *Sambrano* as persuasive and well-reasoned. Adopting the panel majority's nimble avoidance of *White*, you invoke *Drew* and allow your plaintiff to get an injunction without exhausting. Of course, you have to sidestep *Sandoval* and *Ross*—not to mention *Sampson*—but you have the comfort of knowing that you're in good company with the *Sambrano* majority. You're somewhat befuddled by the fact that *Sambrano* is unpublished, but you say to yourself, "Surely those judges didn't intend that their reasoning and result would apply only to those parties and not to mine. The nonpublication must have been for a reason I don't quite see."

Besides, other courts have already acknowledged *Sambrano* and

treated it as Fifth Circuit law.[23]  And you feel secure knowing that the Fifth Circuit overwhelmingly voted not to rehear *Sambrano* en banc, so you convince yourself that the decision must not be so bad after all.  "At least I won't have to grapple with that pesky exhaustion requirement anymore."

What would the judges on the Fifth Circuit say you should do here? We can't know the answer, at least for now, because the full court responds to my panel dissent and the petition for rehearing with a big, wide yawn. These critical conflicts remain irreconciled.

\* \* \* \* \*

Every judge on this court adheres conscientiously to the understanding that we treat similarly situated parties alike.  No judge would be even tempted to decide a case because of who the plaintiff or defendant is.  And that is ever so true in this case.

But the public knows who these litigants are.  When we remove a particular case from our precedents and separate it from the rule of orderliness, we risk unintentionally doing justice (or injustice) to those litigants differently from how we would act for other similarly situated parties.  Failing to treat like cases alike is no small matter.  Yet that is the

---

[23] *Scott v. Kazi*, No. 3:21-CV-2733, 2022 WL 1750041, at \*2 (N.D. Tex. May 10, 2022) (explaining that *Sambrano* "held in an unpublished opinion that a preliminary injunction is available to plaintiffs suing private employers under Title VII, even if they have not first exhausted their administrative remedies" and proceeding to the merits of the plaintiff's request for preliminary relief), *report and recommendation adopted*, 2022 WL 1747854 (N.D. Tex. May 31, 2022); *Halczenko v. Ascension Health, Inc.*, 37 F.4th 1321, 1326 (7th Cir. 2022); *Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 86 n.3 (1st Cir. 2022); *see also* Appellants' Br. at 18, *Woodruff v. Caris MPI, Inc.*, No. 21-11249 (5th Cir. filed Feb. 14, 2022) (ECF No. 34) ("This Honorable Court recently reaffirmed the viability of *Drew* in *Sambrano* . . . .  The Court ruled that the Sambrano plaintiffs were entitled to a preliminary injunction . . . [and] did not need to exhaust their administrative remedies [first].").

consequence—intended or not—of abusing the designation of opinions as un-published.

I know that my distinguished co-panelists and the other members of this court have approached this case conscientiously. But we must keep un-intended fallout in mind when we are tempted to depart from the regular order. Our job is to apply the law without fear or favor. The rule of orderliness helps us to ensure we live up to that task.

Although I am confident that my colleagues have good reasons for voting, overwhelmingly, not to vacate the panel opinion and rehear this case en banc, we have squandered an opportunity to recommit to principled decisionmaking.

This result replaces the rule of law with the rule of whim. I respect-fully dissent.